**Carroll COLFORD**

v.

**CHUBB LIFE INSURANCE COMPANY OF AMERICA.**

Supreme Judicial Court of Maine.

Argued May 7, 1996.

Decided Aug. 13, 1996.

Reissued Dec. 3, 1996.

---

Daniel G. Lilley (orally), Mark L. Randall, Daniel G. Lilley Law Offices, P.A., Portland, for Plaintiff.

William J. Kayatta, Jr. (orally), Catherine R. Connors, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for Defendant.

Jack H. Simmons, Paul F. Macri, Berman & Simmons, P.A., Lewiston, for University Scholars and Law Professors.

Paul R. Dumas, Jr., Joyce, Dumas David and Hanstein, P.A., Mexico, for Consumer Federation of America.

Edward W. Gould, Gross, Minsky, Mogul & Singal, P.A., Bangor, for Maine Trial Lawyers Association.

Christopher C. Taintor, Norman, Hanson & Detroy, Portland, for UNUM, American Council of Life Ins., Health Ins. Assoc. of America.

Before ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

CLIFFORD, Justice.

Chubb Life Insurance Company of America (Chubb) appeals from a judgment entered in the Superior Court (Somerset County, *Kravchuk, J.*) awarding plaintiff Carroll Colford compensatory and consequential damages for the breach of an insurance contract. Chubb contends that the court erred as a matter of law in concluding that two conditions of the contract issued to Colford, conditions that Colford did not meet, did not preclude contract recovery. Colford cross-appeals from the judgment notwithstanding the verdict in favor of Chubb on Colford's claim for intentional infliction of emotional distress and an award of punitive damages. Colford contends that Chubb did not properly preserve the contract issue, that in any event the court correctly construed the contract, that there was sufficient evidence to support the emotional distress claim and, therefore, the court erred in setting aside the jury's verdict and assessment of emotional distress and punitive damages. We conclude that Chubb properly preserved the issue of the validity of the contract. The formation of a binding insurance contract with Colford was contingent on Colford being "acceptable on that date under the Company's rules . . . for the [plan] and benefits . . . applied for." Because those conditions were not satisfied, there was no contract in effect and thus there was no breach of contract. Accordingly, we vacate the judgment on the breach of contract claim. Because Chubb's conduct does not rise to the level of outrageousness necessary to support a claim of intentional infliction of emotional distress, we affirm the judgment notwithstanding the verdict on that claim and on the award of punitive damages.

Carroll Colford was a self-employed insurance sales agent who sold policies for a number of insurance carriers, including Chubb. On April 22, 1991, Colford applied for disability insurance with Chubb. Colford applied for coverage providing a benefit amount of $2000 per month, payable in the event he became permanently disabled.[1] Colford also applied for the additional "own occupation" benefit available under the plan, which covers the insured if he becomes disabled and unable to perform his listed occupation, even if he is not disabled for purposes of other types of work. On that date, Colford was given a one-page "Receipt and Conditional Insurance Agreement." The conditional receipt states in pertinent part:

1. DATE INSURANCE BEGINS. The insurance will begin on the latest of the date of the Receipt, the date of the Application, or the date of the last Medical Application, Part II, required by the Company on all persons proposed for insurance SUBJECT TO THESE TERMS AND CONDITIONS AND THOSE OF THE POLICY APPLIED FOR.

a. An advance payment at least equal to one month's premium must be made in exchange for the completed receipt which bears the same date and number as the application; it cannot be less than $50.00; and

b. *All persons proposed for insurance are acceptable on that date under the Company's rules for standard rates for the plan, benefits and amounts applied for.*

2. DATE INSURANCE ENDS. Insurance will end on the earliest of these dates, *if* it begins under the Conditional Insurance Agreement:

a. 60 days after the date of the receipt;

. . . .

---

1. The coverage was referred to as the Professional Protector Plan.

c. The date the advance payment is mailed to the Owner;

d. The date the policy is issued and delivered to the Owner on a standard basis; the first premium must be paid in full.

3. PREMIUM REFUND. Return of the advance payment will be made to the Owner, if insurance is declined, or the policy, if any, as issued is not taken. If the policy is taken, the advance payment will be a credit toward the first year's premium due under the policy.

(Emphasis added.) An integration clause at the bottom of the receipt provides: "This Agreement states all the terms and conditions of your agreement with the Company for Conditional Insurance."

As of April 25, 1991, Colford had completed the application, tendered one month's premium, and submitted to the required medical examination. On April 30, 1991, Colford fell down a flight of stairs and seriously injured his back. The pain and stiffness resulting from his injury was aggravated by sitting, thus rendering prolonged driving intolerable. As a self-employed insurance sales agent, Colford drove approximately one thousand miles per week.

Colford did not immediately inform Chubb of his injury. On May 3, Philip Wolfe, the Chubb underwriter responsible for evaluating Colford's eligibility for a permanent insurance policy, informed Colford that he was not eligible for the "own occupation" benefit because this extra rider was not available for the job classification "insurance agent." On May 20, Wolfe offered Colford a permanent insurance plan at standard rates, but with two changes from Colford's initial application: (1) the "own occupation" benefit rider would not be included; and (2) there would be an exclusion rider for back injuries. Col-

ford was not offered "whole body" coverage because his medical history revealed a 1989 diagnosis for scoliosis and a spinal dislocation/misalignment known as "subluxation." Pursuant to Chubb's underwriting policies and guidelines, this pre-existing condition precluded coverage for back injuries. Colford did not file a claim for his injury until June 4.[2] Because Chubb had already determined that the conditions stated in the conditional insurance agreement had not been satisfied, Chubb denied Colford's claim for lack of any existing coverage in effect.

Colford filed this action in March 1992. Colford's final amended complaint asserts three claims: (1) breach of contract on the part of Chubb for failure to pay benefits due under the temporary, conditional insurance agreement (Count I); (2) intentional infliction of emotional distress based on actions Chubb took in the course of its investigation and in denying coverage to Colford, and other actions of Chubb (Count III); and (3) negligent infliction of emotional distress (Count IV).[3] In addition, Colford seeks punitive damages for Chubb's allegedly malicious conduct toward him.

By agreement of the parties, the court reserved for itself the question whether a binding contract for insurance existed as of the date of Colford's injury. The court determined that the contract was valid and in effect on the date of the injury. The jury was told that there was a contract and was instructed to determine whether Chubb acted in good faith in denying coverage under the contract, whether Colford was in fact disabled so as to trigger Chubb's obligation to pay benefits, whether Colford, by virtue of his prior income, was eligible for the $2000 monthly coverage amount he had applied for, and whether Colford had fraudulently overstated his yearly income on his initial applica-

---

**2.** Colford argues that Chubb may have become aware of Colford's fall prior to its determination that Colford was not eligible for the "own occupation" coverage or for whole body coverage, and therefore Chubb's decision was tainted by such knowledge. There is insufficient evidence in the record to support a finding that Chubb

became aware of Colford's fall prior to its determination as to the "own occupation" benefit rider and the back injury exclusion.

**3.** Count II, alleging civil conspiracy to defraud, was dismissed by an earlier motion. The dismissal is not challenged on appeal.

tion. The parties agreed that the court would calculate the present value of all past and future disability payments, and the jury would determine the amount of any consequential contract damages arising from the failure to pay benefits. All elements of Colford's tort claims, Counts III and IV, were to be determined by the jury.

At the close of the plaintiff's case, Chubb moved pursuant to M.R.Civ.P. 50(a) for judgments as a matter of law on Counts III and IV. The court granted Chubb's motion on Count IV, the negligent infliction of emotional distress claim.[4] At the close of all the evidence, Chubb's renewed motion pursuant to M.R.Civ.P. 50(b) for judgment as a matter of law on Count III, the intentional infliction of emotional distress claim, was denied. The court denied Chubb's request to allow the jury to determine whether Colford was eligible for the "own occupation" benefit and for whole body coverage.

The jury returned a special verdict form, answering the interrogatories in favor of Colford on all the questions: that Chubb had refused to issue a permanent policy to Colford in bad faith, that Colford had not misrepresented his income, that he was in fact disabled, and that Chubb's actions satisfied all of the elements of the tort of intentional infliction of emotional distress. The jury awarded Colford consequential breach of contract damages in the amount of $1 million,[5] and compensatory damages in tort for emotional distress in the amount of $500,000. In addition, the jury found that Chubb had acted with malice. Subsequently, after a second hearing, the jury awarded Colford punitive damages for the emotional distress claim in the amount of $24,002,000.

Prior to the court's entry of a judgment, Chubb filed a motion for judgment as a matter of law pursuant to M.R.Civ.P. 50(d) as to Count I. On Count I, the court determined the value of past and future disability benefits to be $465,350 and entered a judg-

ment for Colford on Count I in the amount of $1,465,350 (the $465,350 plus the $1 million in consequential damages found by the jury). The court later reduced the jury's consequential damages award from $1 million to $352,000, and entered a final judgment on Count I in the amount of $817,350 ($465,350 disability damages plus consequential damages of $352,000). The court granted Chubb's renewal of its Rule 50(b) motion for a judgment as a matter of law on Count III, setting aside the jury's verdict because the elements of the tort of intentional infliction of emotional distress had not been proved. The court also set aside the award of punitive damages. These appeals by both parties followed.

## I. The Breach of Contract Claim

### A.

Colford contends that Chubb has not preserved the breach of contract issue because it failed to move for a judgment as a matter of law on that issue prior to the jury's retiring for deliberations. We disagree. Chubb's Rule 50(d) motion was directed primarily at the issue that the court, with the consent of the parties, reserved to itself, i.e., the construction of the conditional contract. Although the court tentatively had decided that issue during the trial and before the jury answered the interrogatories presented to it, the court addressed the issue again following the filing of the Rule 50(d) motion and prior to the entry of a judgment on Count I. Rule 50(d) allows a motion for judgment as a matter of law to be made at any time on any claim in an action tried to a court. Although this was a jury trial, the issue that was the subject of the Rule 50(d) motion was for the court, and no one has asserted that evidence could have been presented or any further legal argument made that would have had a bearing on the court's determination. Even were Rule 50(d) to be read narrowly so as not to apply here where the case was not tried entirely to the court,

4. Colford does not challenge this decision on appeal.

5. The consequential damages were based on Colford's loss of his income-producing real estate, which he attributed to Chubb's wrongful denial of disability coverage.

Colford did not object to the timing of Chubb's Rule 50(d) motion and, accordingly, failed to preserve the issue of timeliness. *See Whelan v. Abell,* 48 F.3d 1247, 1251 (D.C.Cir.1995) (defendant's failure to raise defense at pre-verdict motion does not preclude consideration of that defense in post-verdict motion when plaintiff failed to object).

### B.

■■■ In reserving to itself the construction of the conditional contract, the court correctly concluded that the contract is unambiguous and that its interpretation is a question of law. *Globe Indem. Co. v. Jordan,* 634 A.2d 1279, 1282 (Me.1993). A contract is ambiguous only if it is reasonably susceptible to two or more interpretations. *Fitzgerald v. Gamester,* 658 A.2d 1065, 1069 (Me.1995). If the contract is ambiguous, it will be construed against the insurer so as to comply with the objectively reasonable expectations of the insured. *Peerless Ins. Co. v. Brennon,* 564 A.2d 383, 386–87 (Me.1989) (citations omitted). This is not to say, however, that every time an insurer and an insured disagree on the meaning of the contract, the insured's interpretation must prevail. Mere hope of coverage by the insured, or inability of the insured to understand the policy, does not render the contract ambiguous. *Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16, 19 (Me.1990) ("There are many words, phrases or paragraphs in a standard insurance contract that a first time reader does not understand. That circumstance does not justify excising such provisions from the contract.") (footnote omitted); *see also Peerless,* 564 A.2d at 386 (overruling *Baybutt Constr. Corp. v. Commercial Union Ins. Co.,* 455 A.2d 914 (Me.1983), stating that "the Court in *Baybutt* mistook complexity for am-

biguity and thus erred in" ruling in favor of the insured).[6]

The trial court concluded that the insurance contract provided coverage to Colford on a *temporary* basis for the plan for which Colford applied and that the conditions relied on by Chubb to preclude coverage—that there was no "own occupation" total disability coverage for an insurance agent, and that "whole body" coverage was not available to Colford because of his preexisting medical condition—could apply only to the *permanent* insurance that was to be effective *after* Colford's injury. The court relied on language in *Palmer v. Mutual Life Ins. Co. of New York,* 324 F.Supp. 254 (D.Me.1971), to conclude that Chubb's receipt and conditional insurance agreement was an "approval" type of receipt and created insurance that was temporary.

It is true that if Chubb's receipt and conditional insurance agreement were an "approval" type of receipt, i.e., one in which coverage depends on the subjective approval of the insurer and becomes effective only at the subjective discretion of the insurance company, then such an agreement likely would have created only temporary insurance. *Gaunt v. John Hancock Mut. Life Ins. Co.,* 160 F.2d 599, 601–03 (2d Cir.1947). The rationale for finding temporary coverage in such cases is that the subjective condition of approval creates an ambiguity, an illusionary promise on the part of the insurer, so that enforcement of the condition would be unconscionable. *Id.* at 602–03. Indeed, a few jurisdictions mandate that temporary coverage be in effect on nearly all conditional insurance agreements unless the insurance company returns the premium and rejects the application. *See Smith v. Westland Life Ins. Co.,* 15 Cal.3d 111, 123 Cal.Rptr. 649, 658, 539 P.2d 433, 442 (1975). That rule, however, has been adopted in only a few states and fails to give effect to the clear language appearing in Chubb's receipt.[7]

---

**6.** Chubb since has issued a revised version of its "conditional receipt" that more clearly explains that coverage is contingent on the applicant being acceptable for the plan, benefits, and amounts for which he or she applied. Colford argues that this revised version is proof that the older version, issued to Colford, provides him coverage. We disagree. The fact that a term or phrase can be made clearer by the addition of more explicit language does not necessarily render that term or phrase ambiguous. All statements can be made more explicit to some degree.

**7.** For a helpful discussion on the meaning and effect of conditional premium receipts, *see Hilde-*

■ Chubb's receipt and conditional insurance agreement is not an approval type receipt. Coverage for the plan for which Colford applied did not depend on the subjective acceptance of the insurer. Rather, Colford's eligibility for the insurance plan for which he applied, disability insurance as an insurance agent, depended on certain criteria that were objectively reviewable: "own occupation" plans were offered only for certain occupations, and "insurance agent" was not one of those occupations,[8] and whole body coverage was not available for persons with certain medical histories, including Colford's.[9] The rejection of Colford's application based on these objective criteria was conveyed to Colford prior to Chubb's knowledge of his injury.

■ These provisions of the receipt and conditional insurance agreement are unambiguous. Paragraph b of Part 1 is a condition precedent to the formation of a binding contract for temporary insurance. Contrary to Colford's interpretation that paragraph b is an affirmative statement that *all* applicants are acceptable, it clearly provides as a condition that applicants be acceptable based on Chubb's criteria. Paragraph b must be read in conjunction with and as an integral and essential part of the entire agreement. As we stated in *Peerless:*

> [I]n determining whether an insurance contract is ambiguous, the long-standing rule in Maine requires an evaluation of the instrument as a whole.
>
> "A contract of insurance, like any other contract, is to be construed in accordance

with the intention of the parties, which is to be ascertained from an examination of the whole instrument. All parts and clauses must be considered together that it may be seen if and how far one clause is explained, modified, limited or controlled by the others."

*Peerless,* 564 A.2d at 384–85 (quoting *Swift v. Patrons Androscoggin Mut. Fire Ins. Co.,* 125 Me. 255, 256, 132 A. 745 (1926)).

Paragraph b requires that an applicant be acceptable for the plan applied for in order to form a binding contract for temporary coverage.[10] An insurance policy is nothing more than the sum of its parts, including the benefits it provides and the injuries or accidents it excludes; any variation in these characteristics produces a qualitatively different policy. The plan for which Colford applied—a plan *with* "own occupation" coverage and *without* any exclusion for back injuries—was one for which he did not qualify and was not the plan he was offered. The fact that the advance premium paid was sufficient and did not constitute the reason why Colford was not acceptable does not convert the conditional receipt into temporary insurance without regard to the conditions.

■ Whether the conditions precedent to the formation of a binding contract have been satisfied ordinarily is a question of fact for determination by the jury. *Haworth v. Feigon,* 623 A.2d 150, 160 (Me.1993). In this case, however, the parties agreed that the contract is unambiguous and that its interpretation is a question of law. Under the terms of this conditional contract, Colford was not eligible for the plan and benefits for which he applied, and therefore Chubb was entitled to a judgment as a matter of law.

brand v. Franklin Life Ins. Co., 118 Ill.App.3d 861, 74 Ill.Dec. 280, 455 N.E.2d 553 (1983).

**8.** Chubb's underwriting manual makes clear that "insurance agent" is an identifiable occupation and that an "own occupation" rider is available only to certain specified occupations; the manual's list does not include insurance agents.

**9.** Colford's medical records, available to Chubb before it learned of Colford's injury, disclose that

he had been diagnosed with a medical condition, subluxation of the spine, indicating a dislocation or misalignment of the vertebrae. Chubb's medical underwriting manual required a rider excluding disabilities resulting from the middle or lower back when an applicant was diagnosed with subluxation of the spine.

**10.** If the applicant does meet the conditions of paragraph b and is acceptable, the coverage is effective from the date of the receipt or the date of the application.

## II. Intentional Infliction of Emotional Distress

Colford also contends that the trial court erred in setting aside the jury verdict in his favor on the intentional infliction of emotional distress claim. To prevail on a claim of intentional infliction of emotional distress, the plaintiff must show that:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community;" (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "severe" so that "no reasonable man could be expected to endure it."

*Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me.1979) (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965)) (comments and internal citations omitted).

"To challenge a jury's verdict on appeal, the appellant must demonstrate that, taking all evidence in the light most favorable to the plaintiff, together with any justifiable inferences, there was no credible evidence upon which a rational jury could have found the facts as it did." *Latremore v. Latremore*, 584 A.2d 626, 630 (Me.1990) (citing *Gurski v. Culpovich*, 540 A.2d 764, 767 (Me.1988)).[11]

■ In the context of an intentional infliction of emotional distress claim, we have stated that

> [i]t is for the Court to determine, in the first instance whether the Defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery, or whether it is necessarily so. Where reasonable [people] may differ, it is for the jury, subject to the control of the Court, to determine whether, in a particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

*Rubin v. Matthews Int'l Corp.*, 503 A.2d 694, 699 (Me.1986) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. h, at 77 (1965)). Thus, while the jury must determine whether the elements of the tort were in fact satisfied, the court must first determine whether, as a matter of law, the facts alleged are sufficient to satisfy the elements. *See also Gray v. State*, 624 A.2d 479, 484 (Me.1993) ("The determination of extreme and outrageous conduct from undisputed facts is an issue for the court.").

In order to secure emotional distress and punitive damages in this action, Colford must demonstrate that Chubb committed *independently* tortious conduct *beyond* the denial of Colford's disability claim.[12] *See Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 776 (Me.1989). Colford relies on evidence that Chubb engaged in the following conduct: (1) In the defense of the contract claim, Chubb required Colford to submit to a medical examination, *see* M.R.Civ.P. 35, that the evidence showed was painful, was performed by a rude and sarcastic doctor, and upset Colford; (2) Chubb's attorney attended a hearing on Colford's claim for workers' compensation benefits [13] and communicated with the attorney for the insurance company (not Chubb) defending the claim. Such action upset Colford, who had been an agent for

---

11. Although the analytical standard essentially is the same when considering a motion for a judgment as a matter of law, M.R.Civ.P. 50, we have expressed a strong preference for the entry of a judgment notwithstanding the verdict, which avoids the need for a second trial should the trial court's decision be vacated on appeal. *Bedard v. Pellon*, 606 A.2d 205, 207 (Me.1992); *Reed v. Rule*, 376 A.2d 445, 446 (Me.1977) (citing *Moore v. Fenton*, 289 A.2d 698, 700 n. 1 (Me.1972)). Accordingly, the denial of a motion for a judgment as a matter of law and the subsequent grant of a judgment notwithstanding the verdict does not reveal confusion or waffling on the part of the trial court but, rather, demonstrates a wise use of judicial resources.

12. The jury in this case concluded that Colford had proven the elements of intentional infliction of emotional distress in the context of their being told that there was a contract and after having found that Chubb had breached its contractual duty to pay Colford's disability claim in bad faith. As discussed in the opinion herein, because no such duty existed, no breach occurred.

13. Colford was found to be totally disabled for workers' compensation purposes.

Chubb for a number of years; (3) despite having told Colford not to worry about his securities registration which he used to sell securities through Chubb Securities, a wholly-owned subsidiary of Chubb, Chubb Securities canceled the registration after hearing of Colford's disability and suit against Chubb Life; and (4) after initially waiving Colford's life insurance premiums because of the disability, Chubb subsequently revoked the waiver on the basis that Colford did not qualify for the waiver, and Colford subsequently lost his life insurance coverage for failure to pay his premiums. Colford presented evidence that he suffered emotional distress, citing a loss of sleep, bleeding ulcers, coughing up blood, depression and withdrawal from friends.[14] Additionally, at trial, Chubb witnesses invoked the attorney/client privilege and refused to answer questions concerning Chubb's pretrial conduct. Colford argues that such conduct on the part of the witnesses allowed the jury to infer that Chubb acted with improper motives.

■ Although Colford presented evidence of a cumulative number of acts and circumstances that adversely affected him in a substantial way, he must demonstrate that Chubb's actions arose independently of its denial of the disability claim, were intentionally or recklessly inflicted, and were so "extreme and outrageous" as to exceed "all possible bounds of decency," and be regarded as "atrocious" and utterly intolerable in our civilized society. *Vicnire*, 401 A.2d at 154. The attitude and conduct of the physician who examined Colford, on this record, cannot be attributable to Chubb. Chubb's attorney's attendance at the workers' compensation hearing and communication with one of the attorneys for the employer's insurer does not constitute the kind of conduct that supports a cause of action in tort for intentional infliction of emotional distress. Neither do Chubb's actions concerning Colford's securities registration and Colford's life insurance

premiums rise to the level of extreme and outrageous, or exceed all possible bounds of decency. Nor do they support a verdict of punitive damages. The court acted without error and within its discretion by entering a judgment notwithstanding the verdict on Colford's tort claim.[15]

The entry is:

Judgment as to Count I vacated. Remanded for entry of a judgment for the defendant on Count I. Judgment affirmed in all other respects.

All concurring.

---

14. In addition, Colford was unable to meet the mortgage payments of his commercial and rental properties and subsequently lost both to foreclosure. The loss of this real estate was the basis for the consequential damages found by the jury to have been suffered by Colford on his breach of contract claim.

15. Because we conclude that Chubb is entitled to a judgment on all counts, we do not address other contentions of the parties.