2000 ME 21

**Russell B. STULL**[1]

v.

**FIRST AMERICAN TITLE INSURANCE CO.**

Supreme Judicial Court of Maine.

Argued Dec. 8, 1999.
Decided Feb. 8, 2000.

---

1. This case originated from a boundary dispute between Albert and Linda Penney and Capitol City Transfer and a contract dispute between Capitol City Transfer and First American Title Insurance Co. The only dispute remaining on appeal is Russell Stull's tort claim against First American for the intentional infliction of emotional distress. The caption reflects the parties on appeal.

Raymond C. Hurley, Hurley & Mina, Portland, for plaintiff.

William J. Kayatta Jr., Christopher T. Roach., Pierce Atwood, Portland, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and CALKINS, JJ.

WATHEN, C.J.

[¶ 1] First American Title Insurance Co. (First American) appeals from a judgment entered in the Superior Court (Kennebec County, *Hjelm, J.*) following a jury verdict in favor of Russell Stull on his claim for intentional infliction of emotional distress. First American claims that the court erred in denying its motion for judgment as a matter of law because, even taking as true all facts and inferences supporting the jury's verdict, First American's conduct did not satisfy the requirements for tort recovery. We agree and vacate the judgment.

[¶ 2] The historical facts in this case, though not in dispute, are complex. In 1992, Russell Stull purchased a trash collection business located on Bog Road in Augusta. The business, Mid Maine Services, was owned by Ed Betit and was renamed Capitol City Transfer (Capitol City) when Stull purchased it.[2] The primary asset of Capitol City was its location. The Bog Road property was the central office for the business, where trucks were maintained and empty trash containers were stored. Moreover, the property was grandfathered for trash collection and was ideal for servicing Capitol City's customers. The zoning status was particularly important as it was difficult to find a piece of property zoned for trash collection.

[¶ 3] Even though the land was of principal importance for Capitol City, it remained in Betit's hands and was leased to Capitol City until late 1993. At that time, Betit and Capitol City agreed that Capitol City would purchase the land. The present dispute arises out of that transaction. The Capitol City property is the landlocked southern half of a larger, nearly rectangular parcel that had, at one time, been owned entirely by Betit. The northern half of the property is owned by Albert and Linda Penney; there is a deeded right of way over the Penney property providing access to Capitol City's land. The Penneys purchased their property from Betit's father in 1972 through an outconveyance from the larger rectangular parcel. Capitol City knew generally that the Penneys owned the northern plot, but it did not take any action to discover the boundaries of the two lots. Capitol City, however, unequivocally did not intend to purchase the Penney property, and no part of its payment was intended to compensate Betit for that property.

[¶ 4] Unfortunately for Capitol City, it was mistaken about the boundaries of its property. At the time of purchase, Capitol City believed that a tree line marked the northern boundary between its property and that of the Penneys. The tree line, however, was not the boundary between the two lots: Although the northern boundary began at the tree line, it sloped away from the tree line to the south at an angle, passing within 15 feet of Capitol City's building before intersecting the eastern boundary of the property. The tree line, the actual boundary, and the northeastern and undisputed boundary form a triangle that is the basis of the present dispute. The triangle constitutes approximately 20% of the property that Capitol City believed it had been purchasing. The triangle had been used by Capitol City and its predecessor to store trucks and containers and to access the rear of the building. Stull stated that he had seen it used by Betit's business as long ago as 1982. Without this triangle, Capitol City would not have been able to conduct its business at the Bog Road location.

[¶ 5] Capitol City's misunderstanding was not the only mistake involved in this transaction. Capitol City financed the purchase with a loan from Cushnoc Bank.[3] Cushnoc advised Capitol City to purchase

---

2. Capitol City is a closely held corporation and Stull is the sole shareholder. At the time of his purchase of Capitol City, Stull was already involved in the trash collection business as the sole shareholder of another company called Yarmouth Rubbish.

3. Stull, as sole shareholder, pledged his home and all of the assets of Yarmouth Rubbish as collateral and guaranteed the loan personally.

title insurance; Capitol City contacted First American, which agreed to provide coverage.[4] First American's agent, Keith Varner, prepared a commitment letter outlining the scope of coverage. Varner was also Cushnoc's attorney, and, in that capacity, he performed a title search on the property. In this search, Varner missed the 1972 outconveyance to the Penneys. As a result, both the commitment letter and the deed described the entire parcel that had been owned by Betit prior to 1972, or, in other words, both the Penney and Capitol City lots. There is no dispute that these mistaken descriptions do not reflect the intent of Betit, Capitol City, or First American; no one intended to convey, purchase, or insure the entire parcel.

[¶ 6] By November of 1994, the Penneys had discovered that the true boundary line was not the tree line and informed Capitol City that it was using some of their land, an allegation that Capitol City denied. As between the Penneys and Capitol City, the conflict over the triangle can only be characterized as a boundary dispute. The commitment letter—and later the title policy—contained an exception excluding coverage for boundary disputes (the survey exception).[5] Nonetheless, Capitol City informed Varner, as agent for First American, that it believed there was a problem with title to the land. Varner visited the property, and then sent Capitol City a corrected deed he had sent to Betit for Betit's signature. This deed description excepted the Penneys' property, as described in the 1972 outconveyance and thus contained the exact description that would have been in the original deed but for Varner's mistake. Capitol City, however, now refused to accept this deed.

[¶ 7] The dispute between Capitol City and the Penneys continued for several months until the Penneys demanded that Capitol City purchase their entire property or vacate the disputed triangle. At the same time that the Penneys made their demand, Capitol City, through its attorney, sent First American a notice of claim, and then followed that letter with several telephone calls and letters requesting that the insurer both indemnify and defend Capitol City from the Penneys' claims. Meanwhile, Capitol City was unable to purchase the Penney lot and could not vacate the triangle without incurring large economic losses. The Penneys therefore served Capitol City with the summons and complaint that began the present action.[6]

[¶ 8] A day or two after the complaint was filed, First American, through its state counsel Joseph Attura, indicated that it would be denying Capitol City's claim. Up until this point, the contract between Capitol City and First American was based on the commitment letter, as the policy had not yet been issued.[7] On the same day that First American denied the claim, Attura told Varner to issue a policy that conformed with the commitment letter. A

**4.** The title insurance contract was only between Capitol City and First American. Although Stull participated in the negotiations and the closing, he did so only as an officer of Capitol City and not in his personal capacity.

**5.** Experts at trial testified that the survey exception is designed to prevent a title insurer from becoming involved in disputes over where the land described in the policy is actually located on the face of the earth. It is normally waived when the insured conducts a survey, but no survey had been performed in the present case.

**6.** This is the second time this case has come before us. The first time was on First American's counterclaim for declaratory relief, re-

questing a determination that First American had no obligation to defend or indemnify Capitol City against the Penney suit. First American based its counterclaim upon the survey exception in the policy. Although the Superior Court agreed with First American and granted summary judgment in its favor, we vacated the judgment on the ground that a comparison between the complaint and the insurance policy indicated that there was indeed a duty to defend. *See Penney v. Capitol City Transfer, Inc.,* 1998 ME 44, ¶ 7, 707 A.2d 387, 389.

**7.** Part of the reason for the delay was that Varner had been attempting to get an IRS lien against Betit removed from the property.

day later, however, Attura sent Varner another letter specifically countermanding his previous orders; Varner was instead to issue a policy with an additional exception that excluded all claims "resulting from lack of title" to the Penney's land.[8] Varner delayed the issuance of the policy because he was concerned about a possible malpractice claim. It was only after Attura advised Varner that First American would not pursue a malpractice claim that Varner issued the policy. As issued, the policy contained the additional exception requested by Attura, thus creating a discrepancy between the commitment letter and the policy.

[¶ 9] As a result of First American's denial of coverage, Capitol City and Stull filed a third party complaint against First American and others.[9] The third party complaint had four counts against First American: breach of contract, breach of an implied covenant of good faith and fair dealing, unlawful claims practice, and intentional infliction of emotional distress.[10] Stull's individual claim for intentional infliction of emotional distress was predicated upon First American's refusal to defend Capitol City; Stull maintained that this action was extreme and outrageous and had caused him severe emotional distress. Approximately a week before trial, the Penneys settled their claim with Capitol City, requiring it to relinquish its claim to the triangle. The case was tried to the jury on the counterclaim against First American alone. The jury found for Capitol City on the breach of contract claim,[11] and for Stull on his claim for intentional infliction of emotional distress. The jury awarded Stull $85,000 in compensatory damages and, concluding that First American had acted with malice, $1,500,000 in punitive damages.

[¶ 10] At the close of evidence, First American moved for judgment as a matter of law pursuant to M.R. Civ. P. 50. The Superior Court denied the motion after the verdict and entered judgment for Capitol City. Following the entry of judgment, First American again moved for judgment as a matter of law, for a new trial pursuant to M.R. Civ. P. 59, and for remittitur of the punitive damages award. The court denied that motion as well. First American now appeals from the judgment.

■■■■ [¶ 11] On appeal First American initially argues that because Stull was not the insured, he lacked standing to bring the contract claim; his claim was solely derivative and could therefore not be maintained. The issue of whether Stull has standing to bring his claim is jurisdictional. *See Singal v. City of Bangor*, 440 A.2d 1048, 1050 (Me.1982) ("Even though the issue of standing was not raised by the parties, the matter is jurisdictional ...."). Litigants normally may not assert the rights of third parties but must demonstrate that they have received some particularized injury in order to have standing to raise their claim. *See Guardianship of Cardner*, 1998 ME 80, ¶ 8 n. 1, 709 A.2d 731, 732 n. 1; *Common Cause v. State*, 455 A.2d 1, 6 (Me.1983). This requirement is met when the defendant's actions have adversely and directly affected the plaintiff's property, pecuniary or personal rights. *See New England Herald Dev. Group v. Town of Falmouth*, 521 A.2d 693, 695 (Me. 1987). First American is correct insofar as it argues that Stull does not have standing to maintain a suit seeking recovery for the breach of the insurance contract between First American and Capitol City.

8. Attura indicated that he believed the survey exception gave him the authority to add this new exception.

9. The third party complaint also named Varner, his law firm, Cushnoc Bank, and Betit. The counts against these defendants are not at issue in this appeal.

10. Only the claim for intentional infliction of emotional distress was maintained by Stull personally.

11. The jury found that First American had not acted in good faith or dealt fairly with Capitol City and awarded damages of $5,000. First American does not challenge this judgment on appeal.

[¶ 12] Nonetheless, it is not correct to state that Stull is seeking recovery for breach of contract or is, in other words, seeking to stand in the shoes of his corporation, as would be the case in a shareholder derivative suit. Stull argues that the circumstances attending the breach of contract were such as to satisfy the tort of intentional infliction of emotional distress. The tort claim he alleges is his alone, and could, potentially, allow recovery separate from the breach of contract. *See Colford v. Chubb Life Ins. Co.*, 687 A.2d 609, 616 (Me.1996). Stull is not seeking to assert any rights other than his own and therefore has standing to maintain this suit.

[¶ 13] We next turn to the merits. First American appeals from the denial of its Rule 50 motions for judgment as a matter of law. We review "the denial of a motion for judgment as a matter of law to determine if any reasonable view of the evidence and those inferences that are justifiably drawn from that evidence supports the jury verdict." *Larochelle v. Cyr*, 1998 ME 52, ¶ 6, 707 A.2d 799, 801 (internal quotations omitted). The party appealing has "the burden of establishing that the verdict was clearly and manifestly wrong." [12] *Townsend v. Chute Chemical Co.*, 1997 ME 46, ¶ 8, 691 A.2d 199, 202.

[¶ 14] In a claim by an insured against its insurer, tort recovery must be based on actions that are separable from the actual breach of contract. "In order to secure emotional distress and punitive damages in this action, [an insured] must demonstrate that [the insurer] committed *independently* tortious conduct *beyond* the denial of [the] claim." *Colford*, 687 A.2d at 616 (emphasis in original); *Marquis v.*

*Farm Family Mut. Ins. Co.*, 628 A.2d 644, 652 (Me.1993) ("We therefore refuse to adopt an independent tort action for an insurer's breach of the implied contractual obligation to act in good faith and deal fairly with an insured, and limit an insured's remedies for breach of the duty to the traditional remedies for breach of contract ...."). Stull tries to argue within the *Colford* rule and advances the argument that First American's actions in issuing a policy at variance with its commitment letter is somehow more than the breach of the contract created by that commitment letter. Stull argues that First American acted "unilaterally" and committed "an affront to the rule of law" when it altered the policy rather than seeking judicial reformation, that its actions could only be considered a breach of contract if it had "an arguable contractual right to do what" it did, and that it "took calculated action to protect its interests, at the insured's expense, based on its asserted belief as to the proper remedy for its own mistake."

[¶ 15] Despite Stull's protestations, the evidence does not support the conclusion that First American engaged in any other action than breaching its contract. Those who breach contracts often act unilaterally to protect their own interests, without first seeking judicial intervention to protect the other party. Indeed, First American does not argue on appeal that it did something it was legally entitled to do—it does not argue this because it does not contest the finding that it breached the contract. First American entered into a contract when it issued the commitment letter. The commitment let-

---

12. Stull argues that this language only allows for a deferential review of the judgment. This overstates the standard of review. To the extent that First American seeks to challenge the factual findings made by the jury, we do undertake the deferential review Stull urges. First American, however, does not challenge the jury's factual findings, but contends that these findings—and all inferences that may be drawn in favor of them—do not satisfy, as a matter of law, the elements of the tort. *See*

*Colford*, 687 A.2d at 616 ("It is for the Court to determine, in the first instance whether the Defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery or whether it is necessarily so.") (quoting *Rubin v. Matthews Int'l Corp.*, 503 A.2d 694, 699 (Me.1986)). The Court reviews issues of law *de novo*. *See H.E. Sargent, Inc. v. Town of Wells*, 676 A.2d 920, 923 (Me. 1996).

ter bound First American to issue a policy in conformity with its provisions. Its failure to do so was a breach. Stull is seeking to recover tort damages for an action that is purely a breach of contract.

[¶ 16] This, however, does not end the matter. *Colford* directly limits the right of the *insured* to sue the insurer in tort. Stull is not the insured, but instead seeks to recover as a third party injured by the bad faith breach. The Superior Court distinguished *Colford* on these grounds and based its denial of First American's motions for judgment as a matter of law on the theory that *Colford* was "inapplicable here where the tort claimant is not the same person or entity as the insured."

[¶ 17] Whether the *Colford* rule applies to third parties is a question of first impression. Allowing third parties to sue because an unadulterated breach of contract has caused them emotional distress conflicts with established precedent in other areas. Third parties to contracts are strictly limited in their ability to maintain an action under contract law. *See Fleet Bank of Maine v. Harriman,* 1998 ME 275, ¶ 6, 721 A.2d 658, 660. A third party harmed by a breach may only sue for breach of contract if the contracting parties intended that the third party have an enforceable right. *See Devine v. Roche Biomedical Laboratories,* 659 A.2d 868, 870 (Me.1995). Limiting *Colford* to claims by the insured would essentially eliminate the requirement that a third party prove the parties' intent and would allow the third party to have a more extensive recovery than the insured for what is essentially the same injury. Contract damages are more limited than compensatory damages for a tort and, "[n]o matter how egregious the breach, punitive damages are unavailable under Maine law for breach of contract ...." *Drinkwater v. Patten Realty Corp.,* 563 A.2d 772, 776 (Me.1989).

[¶ 18] We appreciate the court's concern that the presence of an action for breach of contract by the insured should not necessarily bar a third party tort claimant from

recovery. *Colford,* however, does not implicate this concern—it merely requires that a recovery in tort be based upon conduct, independent of the breach of contract. In the absence of such independent conduct, there is no tort recovery by anyone. Because Stull proved nothing more than a simple breach of contract, his action for intentional infliction of emotional distress fails.

The entry is:

Judgment vacated. Remanded for entry of judgment in favor of First American.

