STATE OF MAINE

LINCOLN, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-02-036

RECEIVED AND FILED
LINCOLN COUNTY SUPERIOR COURT

SEP 2 8 2004

SHARON SIMPSON
CLERK

DEBRA ANN WEAVER,
Individually, as Parent and
Next Friend of NICHOLAS
SULLIVAN and NICOLLE
SULLIVAN, and in her
Capacity as Trustee for the
DEBRA ANN WEAVER
AGREEMENT OF TRUST,
and CALVIN WEAVER,

        Plaintiffs

      v.

DAVID K. BLAKE, CAROL
J. BLAKE and MIDDLESEX
MUTUAL ASSURANCE COMPANY,

        Defendants

**DECISION AND ORDER**

DONALD L. _____
LA_____

OCT 8 2004

## I.    Introduction.

This matter is before the court on separate motions for summary judgment filed by defendants David and Carol Blake ("David" or "Carol" or "Blakes") and by defendant Middlesex Mutual Assurance Company ("MMA"). Also pending are the related motions, namely plaintiffs' motion to strike Middlesex Mutual Assurance Company's supplemental statement of material facts and plaintiffs' motion for leave to file surreply memorandum.

This order is intended to dispose of all four motions.

A brief recitation of the elements of the plaintiffs' complaint and the facts they allege which relate to their grievances may assist in the understanding and disposition of the pending motions.

The Blakes, husband and wife, listed their oceanfront property on Wiscasset Point in Westport for sale with a local realtor, Roy Farmer. In doing so, they filled out two disclosure statements – one dated October 24, 1998, the other dated April 10, 1999. These statements recited that (1) there were no "malfunctions" in the septic system, (2) that "there has been a small leak around the French doors," and (3) there were no other known material defects to the property. Complaint, ¶ 11.

The Weaver family, Debra Weaver, her husband Calvin Weaver "Calvin", and her two children Nicholas Sullivan "Nicholas", and Nicolle Sullivan "Nicolle" (collectively, the "Weavers"), through their own realtor, Anne Bever, became interested in the Blakes' property which was for sale at $425,000.

Debra Weaver ("Debra") toured the home with her children on May 20, 1999. The Bakes were not present. During the tour, Debra observed one or more holes cut out of the residence's lower-level ceiling.

Debra ultimately agreed to purchase the Blakes' property for $422,000.

With respect to the hole or holes in the ceiling, Carol wrote on July 13, 1999 that, "the problem with the French doors leading to the deck has been rectified, as well as the repair of the ceilings."" Complaint, ¶ 12. The Blakes also submitted a water quality test dated June 25, 1999, which indicated that the well water was satisfactory.

The closing occurred on August 2, 1999, with $425,161.40 as the final price aid.

The Weavers arranged through an insurance agency to purchase a homeowners' policy with MMA, effective August 2, 1999.

According to the Weavers, soon after they moved in mold began to appear on the lower level bathroom ceiling and elsewhere in the residence. Next, a few weeks later, during a significant rainstorm, the Weavers experienced "extensive water intrusion" at

the several sets of the French doors on the upper level of the residence and at various points in the roof and chimneys. Complaint, ¶ 16.

Further investigation by the Weavers showed leakage problems and "severe" water damage in the vicinity of the upper level French doors, including damage to the plywood sub-flooring, insulation, and throughout the wood framing of the home's lower level walls which were found to be "completely rotted." Complaint, ¶ 17. The Weavers claim that this invasion of water into their home brought several strains of mold with it, some of which are toxigenic.

The Weavers allege that the invasion of these molds into their house required them to dispose of affected personal belongings, or to treat them with a cleaning process, and to remove structural elements of the house. They also say that the molds and fungi entered their respiratory and circulatory systems resulting in "severe and permanent health problems." Complaint, ¶ 21.

Also after moving in, the Weavers say they learned that "several thousand feet" of piping in their home was made of polybutylene ("PB") which was defective and required "complete replacement." Complaint, ¶ 22. They also found that the dishwasher leaked.

The Weavers also claim that in early January, 2000, they "experienced significant water intrusion into their boiler room" where the well water pipe passes through the exterior wall. This resulted in several inches of water flooding the lower level of their home, destroying carpets and personal belongings. Complaint, ¶ 23.

Next, they say, after they moved in, the Weavers found that the septic system contained major defects manifested by excess sewage in the backyard. They also claim that in January, 2000, a "belching"" episode occurred during which sewage came up

through plumbing fixtures onto floors and carpets. Complaint, ¶ 24. This required complete replacement of the septic system.

Finally, the Weavers claim that after they moved in the water contained "a very high concentration" or manganese which required them to install a water filtration system in the house. Complaint, ¶ 25.

The plaintiffs allege that soon after they experienced the water intrusion through the French doors in August, 1999, they contacted MMA "to determine whether their insurance contract may cover the damage suffered as a result of the intrusion." Complaint, ¶ 96. A MMA representative responded several days later and was shown the mold, various points of water intrusion, as well as damage from a leaking dishwasher. He advised that he did not believe that the insurance contract provided coverage for the water damage via the French doors and that "the mold growth on the ceilings of the residence's lower-level living room, bedroom and bathroom were not covered." Complaint, ¶ 96.

In their negligence count, the Weavers allege that MMA, among other claimed shortcomings, failed "to disclose to the Weavers what Middlesex knew or should have known regarding the dangers of mold in the Weavers' home." Complaint, ¶ 111.

The Weavers allege that over the next "two and one-half years" they made numerous attempts without success to have MMA decide whether they would cover the losses relating to the leaking French doors, the leaking well water pipe and the defective septic system. Ultimately, MMA wrote the Weavers, denying their claims relating to water intrusion from the leaking French doors and well water pipe, the mold growth and the damage from the "defective" septic system. Complaint, ¶ 98. MMA did, however, provide "partial coverage" for the PB pipes and for property damage relating to the dishwasher leak. *Id.*

Based on these factual claims, restated here in an abbreviated way, the plaintiffs filed a 38-page complaint against the Blakes and MMA.

The grievances against the Blakes are expressed in 10 counts as follows:

| | |
|---|---|
| Count I: | Fraudulent Misrepresentation |
| Count II: | Intentional Nondisclosure |
| Count III: | Negligent Misrepresentation |
| Count IV: | Negligent Nondisclosure |
| Count V: | Unjust Enrichment |
| Count VI: | Intentional Infliction of Emotional Distress |
| Count VII: | Negligent Infliction of Emotional Distress |
| Count VIII: | Breach of Contract |
| Count IX: | Negligence |
| Count X: | Punitive Damages |

The Weavers have cited MMA in the remaining counts in the complaint. They are:

| | |
|---|---|
| Count XI: | Breach of Contract |
| Count XII: | Breach of the Implied Covenant of Good Faith and Fair Dealing |
| Count XIII: | Negligence |
| Count XIV: | Violation of 24-A M.R.S.A. § 2436-A(1) |
| Count XV: | Fraudulent Misrepresentation |
| Count XVI: | Negligent Misrepresentation |
| Count XVII: | Intentional Nondisclosure |
| Count XVIII: | Negligent Nondisclosure |
| Count XIX: | Punitive Damages |

## II. Discussion.

### A. MMA's Motion for Summary Judgment.

In this motion, MMA asks for summary judgment in its favor on all nine counts pending against it. In its memorandum[1] supporting the motion, MMA has expressed its argument in three points: (1) MMA has paid the plaintiffs for all claims covered under their homeowners' policy; (2) MMA had no duty to provide the Weavers with health advisories, (3) any action or inaction by MMA did not cause the plaintiffs any damage.

---

[1] The memorandum is 25 pages long and therefore violates M.R. Civ. P. 56(f) as no prior leave of court was obtained to file a memorandum of this length. It also relied on a number of incomplete or erroneous citations, a style in drafting which characterizes the memoranda of the other parties, as well. Both circumstances hinders the court in its attempt to address the case expeditiously.

Said differently, MMA's position is that the standard homeowner's policy they provided excludes some of the problems and some of the damage claimed by the Weavers, and that MMA had no duty to warn the plaintiffs about the health hazards from the mold found in their house so that it cannot be held responsible for the alleged injuries to the plaintiffs' health caused by the presence of mold in their house.

With reference to its argument on policy coverage, MMA points the court to the "Exclusions" section of the homeowners' policy sold to the Weavers. At paragraph 2(c), the following pertinent text may be found:

> 2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.
>
> \* \* \* \*
>
> c. Faulty, inadequate or defective
>
> 2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction
> 3) Materials used in repair, construction, renovation or remodeling; or
> 4) Maintenance;

Defendants' Statement of Material Fact ("DSMF"), ¶ 3, MMA's Record, Tab. 3.

In MMA's view, the record shows that the Weavers' losses were due to the faulty or inadequate design, workmanship, materials and maintenance that the home suffered before they bought it. That being so, damages which stemmed from those construction shortcomings are excluded from the contract and the Weavers cannot turn to MMA to seek recovery for the losses claimed.

In support of this contention as to the leaks associated with the French doors, MMA points to the deposition testimony of James Card who stated that "the water intrusion problem of the French doors is due to design problems of the manufacturer,

improper installation and improper adjustment of the door thresholds." DSMF, ¶ 26. He also testified that "the French doors were made of defective materials and were inadequately installed, repaired and maintained." *Id.* As a result, Card recommended to Debra that "the French doors needed to be completely replaced to prevent further water intrusion and damage to the home . . ." *Id.,* ¶ 27.

Also, according to the plaintiffs' expert witness designation, James Card would testify that "the opening in the wall through which the well water pipe entered the residence was improperly sealed, causing water to enter the lower level boiler room." *Id.,* ¶ 39.

The plaintiffs, while agreeing that they had designated James Card as an expert, and that he had testified as MMA reports, offer three arguments why his testimony should be disregarded.[2]

The first of these is that Card's opinions cited by MMA were not as the result of any work he had been retained to do by the Weavers. That is, Card had not been retained to do any "forensic" analysis as to the causes of the water intrusion in the Weavers' house. Plaintiffs' Statement of Additional Undisputed Material Facts ("PSAMF"), ¶ 1. Instead, according to his employer, he was only hired "to assess the already water-damaged areas, make necessary repairs, and, ultimately, replace the leaking French doors." *Id.* Further, according to the Weavers' submissions, Card's opinions as to the door design were based on anecdotal experiences and that he had "no idea what about the design or other features of the Weavers' doors caused water to leak in." *Id.,* ¶ 3.

---

[2] The Weavers only challenge MMA's use of Card's opinions as to the allegedly leaky French doors. They do not contest his opinion as to the cause of the leak around the well water pipe.

The Weavers' second argument is that MMA failed to designate James Card as an expert so that it cannot rely on his opinions in this summary judgment contest.

Finally, the Weavers argue that because Card's testimony ought not to be considered, MMA cannot prevail in its claim that the damage to the Weaver's house was due to a pre-existing construction or design defects so that the homeowners' exclusion language might disqualify their claim for coverage.

In the court's view, none of these arguments are persuasive, and Mr. Card's deposition testimony is appropriate for consideration as to this facet of the case.

In response to the Weavers' first argument, it is of little consequence that they say that Card's opinions go beyond the reasons he was hired; that is, his expertise is to be limited to the tasks he cited in his later affidavit referenced in the plaintiffs' additional statement of material facts. He was designated by the plaintiffs as someone with training and education in the construction trades, who has been in that business since 1975 whose opinions "will be based on his extensive background and knowledge of home construction/remediation, as well as first hand observations of the Plaintiffs' residence." MMA's Record, Tab 5. According to the designation, Card served as the Weavers' general contractor in reconstructing their house which included "analysis of the Plaintiffs' water intrusion and mold/fungal infestation problems detailed in Plaintiffs' complaint . . ." *Id.* Further, the plaintiffs told their opponents that Card would be expected to testify, "inter alia, that the Plaintiffs' residence suffered from a severe water intrusion problem in the areas of: (1) several sets of French doors located on the upper and lower levels of the residence . . ." *Id.* They were also told that Card would be expected to testify "that the water intrusion, particularly in the area of the upper level French doors, caused severe water damage and mold growth in various locations of the residence . . ." *Id.*

At his deposition, Card testified that he was a trained construction professional. Card Dep., p. 66, lines 13-14. He also testified that he attributed some of the leaking "to a design problem" of the manufacturer of the French doors, and some of it to "improper adjustments of the door thresholds and some of the installation," *id.*, p. 69, lines 2-21, 24-25. And, although he declined to express an opinion as to what it was about the design of this brand of French doors so that they allowed water to leak into a house, he did offer the opinion that improper caulking of the doors allowed water to come in and that that was an installation problem that could not be blamed on the door itself. *Id.*, p. 71 line 25 - p. 72 lines 1-5, p. 72 lines 16 – p. 73 lines 1-10. Card assumed that the doors were installed when the house was built. *Id.*, p. 73, lines 17-19.

All this testimony was adduced without objection and no effort by the plaintiffs was made at this deposition to have Mr. Card qualify or depart from his opinions on any grounds. From this, then, MMA was entitled to believe that the Weavers were relying on James Card as an expert who would testify about the causes of leaks into their home, namely the defectively installed French doors.

The Weavers' opposition to MMA's summary judgment motion relies on a later affidavit of Mr. Card which discounts his opinions about the poor installation of the doors as the source of the leaks, but Maine case law suggests that an interested witness may not submit an affidavit contradicting his earlier deposition in order to create a dispute of material fact.[3] *Zip Lube, Inc. v. Coastal Savings Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733, 735.

---

[3] In the court's view, Card qualifies as an interested witness because he was the plaintiffs' general contractor in reconstructing their house, a job for which he billed them approximately $80,000. Card Dep., p. 53, line 7. He was also retained as an expert in this case and paid for that work at $42 per hour. *Id.*, p. 16, line 16.

From all this, the court finds that MMA's reliance on Mr. Card's deposition testimony is appropriate so that it may be considered in the disposition of this motion.

As to the Weavers' second argument, while it may be true that MMA did not retain Card as their expert, they did advise the Weavers and the Blakes that they anticipated "relying upon opinions offered by both plaintiffs and co-defendants' experts . . ." MMA's Reply to Plaintiffs' Statement of Material Facts ("DSAMF"), tab 27. Accordingly, their reliance on Mr. Card's deposition to support their position as to this aspect of the parties' dispute is also appropriate and the plaintiffs should not be surprised that MMA wishes to rely on his testimony.

Finally, the Weavers' argument that, without Mr. Card's deposition testimony, MMA has no basis to claim summary judgment on the grounds that the damages suffered by the plaintiffs are due to defective design or construction problems with their house, and are therefore excluded under the insurance contract, is a meritless one. This is because the court has concluded the opposite herein, namely that MMA may rely on Mr. Card's deposition testimony as admissible evidence on this issue. Moreover, it is the plaintiffs who, upon this summary judgment challenge, must produce evidence, in this instance, that the water damage was a loss covered by their insurance policy with MMA. *Curtis v. Porter,* 2001 ME 158, ¶ 8, 784 A.2d 18, 22 (plaintiff must establish a prima facie case for each element of a causes of action when challenged by a summary judgment motion). They have cited no evidence to support this claim. Indeed, plaintiff Calvin Weaver has testified that the French doors "were made of defective materials and were inadequately installed, repaired and maintained."" DSMF, ¶ 26. That being the case, the Weavers cannot establish a prima facie case that their losses associated with the leaking French doors were covered by their policy with MMA and not

occasioned, as MMA is prepared to prove, by pre-existing design or construction, defects which would be subject to the policy's exclusion language.

As to the leaks around the well water pipe, James Card and plaintiff Calvin Weaver have both testified that the water intrusion at this point was the result of improper sealing or packing of the pipe at the hole where the pipe entered the house. As it is apparent that this defect was the result of faulty or inadequate workmanship or construction, losses caused by this circumstance are not covered by their policy.[4] Moreover, MMA cites the court to another provision of the homeowners' policy issued to the Weavers which excludes coverage for "water damage, meaning: . . . water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building . . . foundation . . . or other structure." MMA Record, tab 3. For this reason, as well, there can be no dispute that MMA's policy would exclude coverage for water which came through the basement wall where the well water pipe enters the house.

With regard to the damages stemming from the malfunctioning septic system, MMA points to the testimony of another plaintiffs' expert, Kent Reed, and other testimony, which can fairly be understood to constitute evidence that the septic system was poorly installed and therefore not covered by the homeowners' policy. The plaintiffs point to no evidence which would contradict this conclusion. Additionally, the plaintiffs do not cite MMA's failure to compensate them for the losses associated with the faulty septic system as a basis for their breach of contract claim. *See* Complaint, ¶ 100. That being so, it is unnecessary to further address this aspect of the parties' debate.

---

[4] The plaintiffs do not address the topic of water damage via the leaking well pipe in their memorandum, suggesting that they agree with MMA's position on this aspect of their water damage claims.

As to the leaks around the chimney, MMA points to the testimony of plaintiff Calvin Weaver to the effect that inappropriate material had been used to repair the chimney. According to MMA, that would constitute defective maintenance of the chimney before the Weavers moved into the house. Again, however, the Weavers do not reference this circumstance in their breach of contract count so it is unnecessary to further address MMA's argument that its policy would not cover this claim.

The final source of leaking cited by the Weavers is the PB piping which, apparently, has been replaced, at least in part. In their complaint, the Weavers allege that MMA breached the insurance contract by denying full coverage for replacing these defective pipes. A similar claim is made about the leaking dishwasher. In this regard, the complaint also alleges that MMA breached its insurance contract by not paying for the losses associated with this circumstance. MMA does not seek summary judgment on these claims, however, perhaps because they have paid the Weavers for some unspecified losses associated with these two alleged circumstances. Nevertheless, these aspects of count XI have not been disposed of by voluntary dismissal or otherwise. So, because these claims are not addressed by the pending motion and have not been dismissed, they must remain as part of this case for trial.

The plaintiffs also claim that MMA has breached its insurance contract by refusing to reimburse them for losses occasioned by mold found in their home. MMA seeks to have this claim eliminated via the pending motion because, it says, the policy does not cover mold damage. In support of this contention, MMA cites the court to the policy provision which reads: "We do not insure, however, for loss: . . . caused by: smog, rust or other corrosion, mold, wet or dry rot." MMA Record, Tab 3, (Homeowners 3 Special Form, p. 9).

The Weavers reply that they are not claiming damages caused by mold, but for the presence of the mold itself which was caused by water intrusion into their home via wind-driven rain, a covered peril. In support of this argument they cite the court to a variety of precedents from other jurisdictions to the effect that policies which exclude coverage for damage caused by mold are not to be interpreted as excluding coverage for the mold itself when the causative factor may be a covered peril.

Most persuasive among the cases cited is *Jussim v. Massachusetts Bay Insurance Co.*, 610 N.E.2d 954 (Ma. 1993) in which the Supreme Judicial Court of Massachusetts held that it is a "well established principle that recovery on an insurance policy is allowed where the insured risk itself set into operation a chain of causation in which the last step may have been an excepted risk." *Id.* at 955 (internal quotation marks omitted). Further, according to *Jussim*, "If that cause [the proximate cause of the loss] is an insured risk, there will be coverage even though the final form of property damage, produced by a series of related events, appears to take the loss outside of the terms of the policy." *Id.* at 955-56.

So here, where there appears to be a dispute of fact as to the cause of the mold, and the plaintiffs are seeking to be reimbursed under MMA's policy for the mold itself, rather than damage caused by the mold, this aspect of the plaintiffs' case must be allowed to survive this motion and proceed to trial.

MMA also claims that the Weavers cannot recover under their policy because they failed to diligently take precautions against losses caused by rain intrusion. In support of this argument, it cites the court to the following provision in the plaintiffs' policy: "We do not insure for loss caused directly or indirectly by . . . Neglect, meaning neglect of the 'insured' to use all reasonable means to save and preserve property at and after the time of a loss." MMA Record, Tab 3, (Homeowners 3 Special Form, p. 11-12).

MMA also refers the court to the policy language which reads: "Your Duties After Loss. In case of a loss to covered property, you must see that the following are done: . . . Protect the property from further damage. If repairs to the property are required, you must: Make reasonable and necessary repairs to protect the property . . ." *Id.*, p. 13.

The fact cited by the MMA to support the argument that the cited language would bar recovery is that the Weavers did not replace the leaking French doors for approximately six months, even though they experienced rainstorms during this period which would cause water damage to the house. The Weavers reply with factual assertions, supported in the record, that they did take steps to stanch the flow of water through the French doors soon after they moved in. From this, it is plain that there is a dispute of fact as to the issue of whether the Weavers neglected this problem or failed to take steps to protect their property. That being so, MMA, at this stage of the proceedings, cannot rely on the cited language of the homeowners' policy to defeat the Weavers' contractual claim.

Next, MMA claims that there are "two extra-contractual" theories of law which would disallow coverage in this case. MMA's Memorandum, p. 15. The first of these is termed by MMA as the "known loss" doctrine which holds that an insured cannot recover when she knew in advance that a specific loss has already happened or that there is a substantial probability that she will suffer or has suffered a loss before the effective date of the policy.

The second legal theorem is called "loss-in-progress" which states that there is no coverage when a loss is already in progress at the time the insurance policy was issued.

The plaintiffs respond that neither theory of insurance law has been accepted in Maine and that it has long been our law that insurance contracts are to be construed "liberally in favor of the insured." *Patrons-Oxford Mutual Ins. Co. v. Dodge*, 426 A.2d 888,

891 (Me. 1981) (citations omitted). Moreover, coverage "foundationally afforded [by the policy] will be 'excluded' by virtue of the operation of a separate provision only where such separately stated 'exclusion' unambiguously and unequivocally negates coverage." *Id.* 426 A.2d at 892. So, in Maine, where we enjoy a healthy jurisprudence in insurance law which recognizes neither principle cited by MMA and which interprets insurance policies in favor of coverage, it appears that the theories advanced by MMA cannot be applied in this case.

As important, even if these legal theories were to be applied in this case, there is a dispute of material fact as to the extent of Debra Weaver's knowledge of potential water invasion into her new home at the time she purchased the policy from MMA. That is, she had been told that the water problem in the home had recently been fully resolved. A fact-finder could thus reasonably find that while Debra knew this house had had a minor water problem in the past, she would not know that there was "a substantial probability" that it would reoccur or that the house had already been damaged by the water. By virtue of the same evidence, a fact-finder could also reasonably conclude that the water losses were not imminent or occurring at the time the policy issued. That being the case, the court must conclude that even if the two legal theories relied on by MMA were viable in our state, there is a genuine dispute of material fact which prevents MMA from securing a judgment in its favor on the basis that Debra Weaver knew of the losses she would incur or that these losses were in progress when she bought the homeowner's policy.

From all of this, the court concludes that MMA's motion may be granted on count XI, Breach of Contract, except for the plaintiffs' claims as to the PB piping, the leaking dishwasher, and the mold which they claim was caused by water invasion.

The remaining counts, except count XIV, sound in tort. Thus, as to count XII, the plaintiffs allege the tort of breach of implied covenant of good faith and fair dealing. As MMA has pointed out, however, our Law Court has specifically refused to "recognize an independent tort of bad faith resulting from an insurer's breach of its duty to act in good faith and deal fairly with an insured." *Marquis v. Farm Family Mutual Insurance Co.*, 628 A.2d 644, 652 (Me. 1993). This is because the obligation of an insurer to deal fairly with an insured is implicit in the provisions of the insurance contract, the breach of which, along with other statutory remedies, provide an insured adequate recourse against her insurer. *Id.* This being the status of Maine law, MMA is entitled to summary judgment on count XII of the complaint.

In seeking favorable disposition on the remaining tort counts, MMA reminds this court that under current Maine precedent, tort recovery by an insured against her insurer must be based on actions "that are separable from the actual breach of contract." *Stull v. First American Title Ins. Co.*, 2000 ME 21, ¶ 14, 745 A.2d 975, 980. That being so, it is evident that the plaintiffs'' generally stated negligence count, count XIII,, cannot survive this motion. That is because that count alleges that MMA negligently breached its duty to the Weavers in the manner it communicated with them and, ultimately, in denying most of their claim. As the Law Court teaches in *Stull v. First American Title Ins. Co., id.,* such claims may constitute a claim for breach of the insurance contract itself, but will not support a separate action in tort because the alleged facts supporting the tort are not independent of those relied in the breach of contract claim.

As a possible exception to this conclusion as to count XIII, the plaintiffs rely on alleged statements by MMA's adjuster, namely that he told Debra that the mold in the house could be cleaned up with bleach when he and MMA should have known that the mold was dangerous to the Weavers' health and therefore should have warned them of

that circumstance. According to the Weavers, the failure to exercise this duty resulted in their health being adversely affected by this mis-advice or by the failure to properly advise and warn of the mold danger.

Even if such actions or inactions were independent of the alleged breach of the insurance contract, they must nevertheless constitute a tort before they are actionable. "The first element any plaintiff must satisfy in a negligence action is that the defendant violated the applicable duty of care owed to the plaintiff." *Decker v. New England Public Warehouse, Inc.*, 2000 ME 76, ¶ 7, 749 A.2d 762, 765. The scope of that duty is a question of law. *Id.*

According to Maine precedent, ". . . absent a special relationship, the law imposes no duty to act affirmatively to protect someone from danger unless the dangerous situation was created by the defendant." *Jackson v. Tedd-Lait Post No. 75*, 1999 ME 26, ¶ 8, 723 A.2d 1220, 1221. A special relationship is one which society recognizes as sufficient to create a duty to affirmatively warn or protect another from danger. *Hughes v. Beta Upsilon Building Ass'n*, 619 A.2d 525, 527 (Me. 1993); *Howe v. Stubbs*, 570 A.2d 1203 (Me. 1990). The number and type of such relationships are limited and generally concern only circumstances in which a party can control the safety of another or in which the affected person could reasonably expect the other to protect or warn her. *See* RESTATEMENT (SECOND) OF TORTS § 314 (1965).

In this case, there is no evidence that MMA or its adjuster created "the dangerous situation" and there is no basis to find that they had a special relationship with the Weavers that would impose on them a duty to warn or protect these insureds from the mold in the house. MMA and its adjuster appear to have had only a business relationship with the Weavers and had no authority or apparent ability to protect them from potentially toxic mold in their own home. Accordingly, the court must find that

MMA had no duty to the Weavers to warn or protect them with the conclusion that the alleged breach of this "duty" is not actionable. Accordingly, this defendant is entitled to summary judgment on this aspect of the plaintiffs' claim as expressed in count XIII.

With respect to tort counts XV, XVI, XVII and XVIII, the plaintiffs' memorandum again relies on the alleged mis-advice of MMA's adjuster to serve as the basis to establish these causes of action.[5] While it appears to be clear that the adjuster had no duty to provide the Weavers with advice on the potential health hazards of mold, and his consult with them as to its remediation was in the context of his handling their insurance claim, several other factors entitle the defendant to summary judgment on these counts.

First, as to count XVIII, Maine common law has never recognized the tort of "negligent non-disclosure" and the plaintiffs have provided no argument why this court should depart from the current status of Maine law to recognize such a cause of action against this defendant. Accordingly, summary judgment will be entered for MMA on count XVIII.

In counts XV, XVI and XVII, the plaintiffs rely on tort theories of Fraudulent Misrepresentation, Negligent Misrepresentation and Intentional Non-disclosure. In order to succeed with these claims, however, the plaintiffs must demonstrate that they arose independently of MMA's denial of its claim for mold damage. *Colford v. Chubb*

---

[5] In counts XV and XVI, which rely on theories of Fraudulent Misrepresentation and Negligent Misrepresentation, the complaint also cites statements by MMA's adjuster that water damage would not be covered by the Weavers' insurance contract as actionable misrepresentations. Because such alleged statements cannot be construed as acts independent of a cause of action based on the denial of the Weavers' insurance claim, they cannot serve as a basis for recovery in tort. *Stull v. First American Title Ins. Co.*, 2000 ME 21, ¶ 14, 745 A.2d 975, 980. It is perhaps in recognition of this solid principle of Maine law that the plaintiffs' memorandum makes no reference to these claimed misrepresentations but relies instead on the alleged misadvice by MMA's adjuster about mold to support the cited tort counts. *See* plaintiffs' opposition memorandum, pp. 14-15.

*Life Ins. Co.*, 687 A.2d 609, 617. In the court's view, they cannot accomplish this on the record provided.

MMA's adjuster's purpose in visiting the Weavers' home was unquestionably to observe and assess their claim under the insurance policy for water and mold damage. PSAMF, ¶¶ 10, 22. According to the Weavers, the adjuster opined that the mold was not covered under the policy and could be eradicated with bleach. That these statements may have been mistaken and, perhaps, unnecessary to this transaction, does not change the fact that they were made as part of the adjuster's assessment of the plaintiffs' insurance claim and, therefore, did not arise independently of MMA's denial of coverage. Because that is the case and because there is no cogent argument to the contrary, the plaintiffs may not, as a matter of law, prevail on counts XV, XVI and XVII and summary judgment must be entered for the defendant on these claims.

Count XIX is entitled "Punitive Damages"" and seeks this type of extraordinary remedy for the tortious conduct described in the counts discussed herein. Because none of these will advance beyond the disposition of this motion, however, there will be no basis for the plaintiffs to recover punitive damages against MMA and summary judgment must be entered in its favor on this count.

Finally, in count XIV, the plaintiffs allege that MMA violated the provisions of 24-A M.R.S.A. § 2436-A(1) which provides remedies to an insured injured by certain actions taken by that person's own insurer. The plaintiffs rely on three subparagraphs of this statute in their effort to have it apply in this case.

In the first of these, the Weavers say MMA violated subparagraph A of the statute by knowingly misrepresenting to Debra that the losses resulting from the water intrusion underneath the French doors were not covered by her policy and by failing to tell her that coverage was available for tearing out and replacing the PB piping.

Complaint, ¶ 118. However, according to *Curtis v. Allstate Ins. Co.*, 2002 ME 9, ¶ 24, 787 A.2d 760, 767:

> [t]o establish a knowing misrepresentation, a plaintiff must provide evidence demonstrating something more than a mere dispute between the insurer and insured as to the meaning of certain policy language. Instead, to survive summary judgment the plaintiff must generate an issue of fact that the insurer *knew* the policy said and meant one thing but told the insured something else.

(Emphasis supplied) (internal citations omitted).

The plaintiffs cite no evidence and offer no argument that would support their claim that MMA violated this subparagraph of section 2436-A(1) by knowingly misleading them as to their policy's coverage. Accordingly, the Weavers may not rely on this part of the statute in seeking its remedies in this case.

However, the plaintiffs also rely on subparagraph B of the cited law which allows recovery upon an insurer's "[f]ailing to acknowledge and review claims, which may include payment or denial of a claim, within a reasonable time following receipt of written notice by the insurer of a claim by an insured arising under a policy." The defendant seeks summary judgment on this claim but refers the court to no undisputed facts in its memorandum which might defeat it. The plaintiffs' response is only slightly better. Their memorandum provides a series of mis-citations to its statement of additional undisputed facts which, once corrected via the court's own interpretation of this document, refers the court to record references which might support their complaint of a tardy response by MMA to their insurance claims. In reply, MMA's memorandum provides little help in resolving this dispute. It references its statement of material facts but gives the court no paragraph number so it might locate the "fact" it relies on to dispute this claim. This being the status of the record, and the court having no duty to search the record to track down material not properly referenced, M.R. Civ.

P. 56(h)(4), the court must conclude that the defendant is not entitled to summary judgment as it has failed to satisfy the court that there are no undisputed material facts as to this aspect of this statutory claim so that it would be entitled to summary judgment thereon. M.R. Civ. P. 56(c).

The plaintiffs also cite subparagraph E of section 2436-A in their quest to recover the damages authorized by this law. Subparagraph E authorizes statutory damages when an insurer "[w]ithout just cause, fail[s] to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear." 24-A M.R.S.A. § 2436-A(1)(E).

The debate over the viability of a claim under this part of the cited statute is hampered by the same conditions. In its memorandum seeking summary judgment, the defendant cites no facts which would entitle it to summary judgment on this claim. The plaintiffs' objection continues the same mis-citations to their statement of material facts although, once corrected, provides a factual basis which would permit a fact-finder to reach the subjective conclusion that MMA failed, without just cause, "to effectuate prompt, fair and equitable settlement of claims" submitted by the Weavers. 24-A M.R.S.A. § 2436(1)(E). MMA's reply to this submission does not overcome this potential finding because it relies on a reference to its supplemental statement of material facts which must be mis-cited as it alleges facts not germane to this dispute. Accordingly, the court cannot conclude that MMA is entitled to summary judgment on this aspect of the plaintiffs' statutory claims because it has provided the court with no record of undisputed facts that would entitle it to judgment as a matter of law on this claim.

In sum, then, the court will be granting MMA's motion for summary judgment in part and denying it in part. Summary judgment will be granted as to count XI except as

to the Weavers' claims for breach of contract upon MMA's alleged failure to pay them for their losses occasioned by the presence of mold, and for the less than full compensation for the presence of, and/or leaking from, PB piping, and the dishwasher leaks. Summary judgment will be entered for MMA on counts XII, XIII, XV, XVI, XVII, XVIII, and XIX. Partial summary judgment will be entered for MMA on so much of count XIV which relies on subparagraph A of 24-A M.R.S.A. § 2436-A(1), but will be denied as to their remaining statutory claims.

## B. Plaintiffs' Motion to Strike Defendant MMA's Supplemental Statement of Material Facts.

Along with its summary judgment reply memorandum, MMA filed a "supplemental" statement of material facts by which it wished to bring to the court's attention that, among other "facts," the Weavers had submitted a redacted report of an expert with their opposition to MMA's summary judgment motion. By this motion, the Weavers object to the court's consideration of this supplemental statement of facts.[6]

According to MMA, the unredacted report would show that the water intrusion and mold in the Weaver's home was chronic and longstanding which would lend support to its defense that the damage to the Weavers' house predated insurance coverage.

MMA's account of the submission of this report by Sanit-Air, the expert, is accurate, except that the Weavers never relied on it in their opposition to the summary judgment motion. That being so, MMA's wish to have the court consider the unredacted report contravenes the plain text of M.R. Civ. P. 56(h)(3) which limits a reply statement of material facts "to any additional facts submitted by the opposing party." Thus, because the Weavers never cited or relied on the redacted report on the

---

[6] At oral argument on the motion for summary judgment, it was agreed by all parties that argument on this motion may occur and that MMA would be relieved of its obligations under M.R. Civ. P. 7(c).

issue of the chronicity of the water leakage or mold presence in their opposition to the summary judgment motion, MMA may not submit the unredacted report with their reply statement of material facts as a supplement to this document. That being so, this motion must be granted.

### C. Blakes' Motion for Summary Judgment.

In this motion, the Blakes seek summary judgment on the ten counts of the complaint which name them as defendants.

As a brief summary of the Blakes' arguments in support of this motion, they tell the court that they had only three communications with the Weavers which correctly advised them of the status of the house's condition, including the water intrusion problem, and that they had never misled the Weavers about other facts of the house's condition including its septic tank and its water quality. Further, the Blakes say, the PB piping was not illegal when the house was built and they had had no problems with the house's heating and plumbing systems. They also say they had never experienced roof or dishwasher leaks and had only seen minor dampness around the well pipe's entry in the basement. They further state that they had never observed mold in the house.

They also argue that, even if they knew of problems with the house, they never had an obligation to the Blakes to make any disclosures about its potential defects as, at that time, Maine law imposed no duty on a seller to disclose property defects to potential buyers unless there was a special relationship between the buyer and seller. *Kezar v. Mark Stimson Assoc.*, 1999 ME 184, ¶ 15, 742 A.2d 898, 903; *Stevens v. Bouchard*, 532 A.2d 1028, 1030 (Me. 1987).

Moreover, the Blakes argue that only Debra could recover against them as she was the purchaser of the house but that she has no cause of action because the Blakes disclosed to her the one problem with the house of which they were aware, namely the

water leaks via the French doors. In this regard, the defendants say, Debra had had an inspector examine the house before she bought it and he had advised her to have more testing done to assess the extent of the water intrusion.

So, in sum, the Blakes argue via this motion, that they had no obligation to disclose any of the problems with the house and those they did reveal were not misleading. They also say that Debra, who is the sole plaintiff with standing to pursue this case, cannot prove any misrepresentations; that is, that the Blakes misled her or misrepresented the condition of the house they sold her. That being the case, the Blakes claim, they are entitled to summary judgment on the entirety of the Weavers' complaint against them.

In counts I-IV of the complaint, the plaintiffs rely on four theories of recovery based on their fundamental claims that the Weavers misled them about the true condition of their house before selling it to them. Thus, in count I, the plaintiffs characterize this grievance as "Fraudulent Misrepresentation." Complaint, p. 7. In order to prevail on a claim of fraudulent misrepresentation, a plaintiff must show:

> (1) that [the defendants] made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing [the plaintiffs] to act in reliance upon it, and (5) [the plaintiffs] justifiably relied upon the representation as true and acted upon it to [their] damage.

*Mariello v. Giguere*, 667 A.2d 588, 590 (Me. 1995).

The Blakes argue that the Weavers cannot prove elements 1 and 5 of this cause of action, namely that they made any false representations in their three communications with the Weavers, that the Weavers "justifiably relied" on any such alleged misrepresentations, or that they were damaged by these acts. Thus, according to the Blakes, the plaintiffs cannot prevail on this cause of action.

As to the first of these contentions, the Blakes tell the court that they gave the Weavers a current water quality test which was acceptable, that the water was not unsatisfactory for drinking, and that they had no knowledge that the water was less than adequate for this purpose. They also say that after they repaired the septic system in 1994 when they bought the property, they experienced "absolutely no problems with the functioning of their septic system . . . prior to the sale to Plaintiffs." Defendants' Memorandum of Law, p. 10. Next, the Blakes say that they disclosed to the Weavers the water intrusion problem around the French doors "which appears to be the source of ninety-nine percent of the Plaintiffs' claims . . ." *Id.* Finally, they assert that they had no problems such as the Weavers encountered with the septic system, plumbing and heating systems, water intrusion (except via the French doors), or any mold associated with water intrusion.

While some of these factual claims enjoy support in the record, the plaintiffs have assembled facts, also properly in the record, which can be understood to dispute the Blakes' assertions. As an exception to this observation, however, it appears that there is no evidence which a rational fact-finder might consider as a false material misrepresentation made by the Blakes as to the water quality of the house they sold to the plaintiffs. As the record shows, the Blakes provided a water quality report dated June 25, 1999, approximately five weeks before the closing, which showed that the water was satisfactory. The only evidence cited by the plaintiffs that the Blakes believed that the water quality was other than as reported is Carol's deposition testimony that the "tap water made [her] hair limp when she washed [it]." PSAMF, ¶ 19. In the court's view, Ms. Blake's subjective dissatisfaction with the water as a medium with which to wash her hair cannot satisfy the plaintiffs' burden of persuasion as to a fraudulent misrepresentation of fact, even though she did not disclose this

shortcoming, because no rational jury could find that such an alleged misrepresentation was either fraudulent or material.

With regard to the septic system, the Blakes allege that they experienced no problems with its functioning after they purchased the house in 1994 when they repaired a broken chamber which their sellers had disclosed to them. Accordingly, in their property disclosure forms they represented that they had experienced no malfunctions of the septic system's leach field or tank. Dep. of D. Weaver, Exh. 11.

The plaintiffs offer evidence, however, which could reasonably be viewed as contradictory to the defendants' claim that they were unaware of problems with the septic system when they sold their house to the Weavers. Specifically, the Weavers point to the testimony of Kent Reed who testified that he visited the subject property in 1994 or 1995 in response to its owner's complaints concerning "strong odor, backing up and a very large wet spot in the back lawn." PSAMF, ¶ 20. At this time he saw sewage on the lawn. Also, according to the plaintiffs' submissions, when Mr. Reed returned to the property in 2000 at the behest of the plaintiffs, he observed similar problems with the septic system. Mr. Reed opined that the owners previous to the Weavers, the Blakes, would have to have experienced problems with the septic system if the Weavers did because Debra Weaver only used the system for a week before she started having problems with it.

While the defendants cite other evidence which could rebut Mr. Reed's testimony, that circumstance does not change the conclusion which the court must here reach, namely that there is a dispute of fact as to whether the defendants falsely represented the condition of their home to the Weavers by knowingly failing to disclose to them that its septic system was defective or that they had experienced no problems with it. In the court's view, such an alleged misrepresentation as to an important aspect

of the fitness of a house would be a material one and actionable if the other elements of fraudulent misrepresentation are met. Because the defendants do not challenge the plaintiffs' ability to prove the remaining elements of this tort and because the court will conclude herein that the plaintiffs may be able to establish that they were damaged by the defendants' alleged misrepresentations, the court cannot enter summary judgment for the defendants on this aspect of count I of the complaint.

As to the water intrusion by the French doors, the defendants say that they disclosed this problem to the plaintiffs in the disclosure forms so that the plaintiffs cannot say they were misled as to this potential defect with the house. The plaintiffs reply that the disclosures by the defendants were misleading because they failed to reveal the extent and seriousness of this problem. The court concurs with the plaintiffs' assessment of this element of the parties' factual disputes.

As the record shows, the Blakes provided a property disclosure form dated October 24, 1998, which stated that "there has been a small leak around French doors." DSMF, ¶ 26. Later, on April 10, 1999, they executed another property disclosure form which provided the same description about the problem with the leaks by the French doors. Last, after the parties had executed the purchase and sale agreement, and in response to a letter from Calvin Weaver dated June 28, 1999, which requested that the damage related to the leaking doors be repaired, Carol, in a letter dated July 13, 1999, advised that, "[t]he problems with the French doors leading to the deck has been rectified as well as the repair of the ceilings." PSAMF, ¶ 2.

From these communications, one would understand that any leaking around the French doors was minor and had been repaired. Instead, the record shows that the Blakes had experienced significant water problems from 1996 forward with various efforts at remediation failing to cure the problem. Indeed, according to the record,

Carol Blake wrote to the doors' manufacturer on January 25, 1999, a date between the dates of the two disclosure forms, telling the company, *inter alia*, that they, the Blakes, have had nothing but problems with four of the sets of doors that face the southeast direction." PSAMF, ¶ 9; C. Blake Dep. , Exh. 15. The letter went on to say, "The water that has poured in has destroyed three ceilings, several of the window casings and sills on the lower level directly below the defective doors. A portion of the hardwood flooring on the first level, adjacent to one of the doors, has also been damaged." *Id.* Finally, the letter suggests that the Blake home was being destroyed by the problem with the French doors.

While the defendants may ultimately argue about the import of these "facts," a fair interpretation of them at this stage of the proceedings is that the Blakes knew of a serious, chronic problem with water invading their house via the French doors but misled the Weavers about the size of this problem, mischaracterizing it as "small." Given that the Weavers have produced evidence that they experienced water problems with these doors soon after they moved in to this house, a fact-finder may also conclude that the Blakes' reassurance to the Weavers that the problem had been rectified was false. Thus, it is plain that there is a dispute of material fact concerning the nature and character of the Blakes' communications received by the Weavers. Because a fact-finder may find these to be fraudulent, the defendants may not secure summary judgment on this aspect of the plaintiffs' claims.

The Blakes also argue that even if their disclosures were misleading, the plaintiffs cannot prove that they "justifiably" relied on these misrepresentations. In support of this contention, they point to evidence in the record showing that Debra inspected the property on several occasions and retained a home inspector who had advised her and Calvin that the water intrusion problem was an active one which required "destructive

repairs" to further investigate the problem. DSMF, ¶¶ 32-36. Thus, according to the Blakes, the plaintiffs had access to information which contradicted the defendants' disclosures so that it was unreasonable for them to rely on these allegedly misleading documents.

In reply, the plaintiffs point to evidence which contradicts the defendants'. They say that their inspector's written report reflected no more of a problem with the doors than defendants had communicated and that the discussion between them and the inspector did not contain the admonitions cited by the defendants. From this, it is apparent that there is a dispute of material fact as to whether or not the plaintiffs reasonably or justifiably relied on the defendants' allegedly misleading disclosures with the result that a fact-finder must ultimately decide this issue.

Next, the Blakes contend that even if they wronged the Weavers, they have suffered no damages because the house has increased greatly in value since they purchased it. Thus, they say, because the measure of damages, as a matter of "hornbook law," would be diminution of fair market value, there are no damages here because the value of the house has not gone down. Defendant's Memorandum, p. 12.

The defendants cite no case in support of this representation as to the status of the law which is contradicted by the holding of *Paine v. Spottiswoode*, 612 A.2d 235, 240 (Me. 1992) which held that the measure of damages under comparable circumstances is the difference in value between what was contracted for and what was rendered. This difference may be measured "by evidence of diminution in market value *or* of the amount reasonably required to remedy the defect." *Id.* (emphasis in original). Accordingly, if the plaintiffs prevail in this case they may recover the latter type of damages which would be unaffected by the increase in value of the house.

Last, the defendants argue that even if the plaintiffs overcome all their other arguments, only Debra Weaver can recover damages for the alleged fraudulent misrepresentations because she was the party with whom the defendants conducted the transaction at issue. The plaintiffs did not respond to this argument, perhaps in recognition that the defendants are correct that fraud cases "are essentially economic in nature and serve to protect economic interests." *Jourdain v. Dineen*, 527 A.2d 2304, 1307 (Me. 1987); Simmons, Zillman & Gregory, *Maine Tort Law* § 19.02 at 19-9 (2001 ed.) Accordingly, this court concludes that the sole plaintiff who may prosecute and recover damages on any fraud count is Debra Weaver, who bought the house, and that those damages are limited to her pecuniary losses. This is true even though Carol Blake's letter of July 13, 1999, which contained allegedly misleading information about the French doors was in response to a letter from Calvin Weaver; he can point to no pecuniary losses and no impact from the alleged fraud on him.

To summarize, the defendants' motion as to count I will be denied as to the plaintiffs' claims for fraudulent misrepresentation as to the condition of the septic system and the leaking French doors because the defendants did make representations as to those two conditions of their house and there is a dispute of material fact as to whether or not those representations were false and whether or not the plaintiffs justifiably relied on them. The only party who may pursue this claim, however, is Debra Weaver, and her damages are not limited to diminution of value, but may include costs of remediation or repair.

The motion will be granted as to the remaining bases for count I because, first, the evidence as to alleged misrepresentations of water quality were not material in nature and, second, the defendants had no obligation to disclose other alleged defects in the house to the plaintiffs and no evidence was presented that there was a special

relationship existing between them so that such an obligation could be found. Thus, the plaintiffs' claims as to nondisclosure of mold, the presence of PB piping, roof or dishwasher leaking, heating and plumbing problems, and intrusion of water through the well water pipe are not actionable because the defendants were neither under a duty to disclose these alleged problems to the plaintiffs, nor is there evidence cited by the plaintiffs that they knew of these alleged problems or misrepresented them. *Kezar v. Mark Stimson Associates*, 1999 ME 184, ¶ 15, 742 A.2d 898, 905.

Count II is entitled "Intentional Nondisclosure" but may be distinguished from count I only in that, rather than alleging that the Blakes made false representations about their property, they actively concealed its cited shortcomings. According to *Fitzgerald v. Gamester*, 658 A.2d 1065, 1069, an articulation of a cause of action in fraud may be expressed in this way, but the plaintiffs must show this element of active concealment or a special relationship, "imposing on the defendant an affirmative duty to disclose." *Id.* Because there is no evidence of a "special relationship'" between the Blakes and the Weavers, the Weavers must show an "active concealment of the truth."

"'Active concealment' of the truth connotes steps taken by a defendant to hide the true state of affairs from the plaintiff." *Kezer v. Mark Stimson Associates, id.,* ¶ 24, 742 A.2d at 905. Obviously, in order to hide the true state of affairs from another one must have knowledge of those things. In this regard, the plaintiffs only refer to the evidence, described infra, as to the defendants' knowledge about the leaking French doors as a basis to support their claim of active concealment of the true state of the house's condition.

The court must concur, as it did in its discussion of count I, that a reasonable fact-finder might conclude that the Blakes fraudulently misrepresented the leaking problem of these doors and did so by actively concealing from the plaintiffs their knowledge of

the nature and extent of this problem which could reasonably be characterized as an active concealment of the real state of affairs.

While the plaintiffs might urge the court to reach a similar conclusion as to the septic system's problems, they do not do so perhaps because there is no evidence of an *active* concealment of the same character or degree of that which relates to the leaking doors. Additionally, the plaintiffs do not argue or cite evidence that the defendants actively concealed the other alleged shortcomings of their house. All this being so, the court must grant the motion as to count II except as it relates to concealment of the condition of the leaking French doors.

The court also determines that because count II sounds in fraud, only economic damages may result and, for the same reasons expressed here as to count I, only Debra Weaver may recover those damages, even though Calvin Weaver may have received false disclosures about the property.

In Count III, the plaintiffs rely on a theory of recovery entitled "Negligent Misrepresentation" based on their assembly of facts which would have them recover damages for the Blakes' negligent statements as to the condition of their house as set out in the property disclosure statements, the water test, and Carol's letter of July 13, 1999, concerning the repair of the French doors.

A cause of action for negligent misrepresentation has been recognized by our Law Court in *Chapman v. Rideout,* 568 A.2d 829, 830 (Me. 1990) by endorsing the Restatement's articulation of this cause of action. It reads:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(1) (1977).

Applying this text to the "facts" in this case, it appears that the plaintiffs, on the record submitted, could establish that the defendants failed to exercise reasonable care or competence in communicating information to the plaintiffs concerning the condition of the septic system or the porous French doors, that that information was false, that it was submitted for the guidance of potential buyers of their home, that, as discussed infra, the plaintiffs justifiably relied on these communications resulting in pecuniary loss, and that the defendants had a pecuniary interest in this transaction.

Consistent with its conclusions as to counts I and II, however, the court finds that there was no evidence of false information provided as to the house's water quality and that there were no disclosures of any type as to its other alleged defects with the result that there are no actionable communications about them which might support this theory of recovery.

The defendants also argue that they are entitled to judgment in their favor on this claim because the plaintiffs were contributorily negligent in, apparently, failing to act on the advice and information given them by their inspector. As noted, infra, however, the evidence concerning that information is in contention and will have to await assessment by a fact-finder.

From this, the court determines that summary judgment may be granted as to this count except as to the alleged disclosures concerning the septic system and the leaks around the French doors. The court also concludes, as *Chapman v. Rideout, id.,* teaches, that damages on this count are pecuniary only and that Debra Weaver is the sole party with standing to pursue them as she is the person who relied on the negligent disclosures and bought the property.

In count IV, the plaintiffs rely on a theory of recovery entitled "Negligent Nondisclosure." As earlier observed in this decision and order, and as argued by the defendants, Maine has never adopted a tort described as "negligent non-disclosure." Although such a theory of recovery is discussed in the RESTATEMENT (SECOND) OF TORTS § 551 (1977), and even though our Law Court often relies on this authority, it must be left to that court to expand our tort law into new territory. Accordingly, the motion will be granted as to count IV of the complaint.

In count V, the plaintiffs rely on unjust enrichment as a theory of recovery. In addressing the pending motion which seeks disposition as to this aspect of the plaintiffs' case, the court will address the defendants' second argument first. That is, the defendants advise the court that unjust enrichment is available only when there is no contractual relationship but, instead, when "on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *Lynch v. Ouellette*, 670 A.2d 948, 950 (Me. 1996) (quoting *A.F.A.B. Inc., v. Town of Old Orchard Beach*, 639 A.2d 103, 105, n.3 (Me. 1994)). However, the Law Court has also recognized that a plaintiff may plead both unjust enrichment and breach of contract "because a fact-finder may find that no contract exists and may still award damages on the theory of unjust enrichment." *June Roberts Agency v. Venture Properties*, 676 A.2d 46, 49, n.1 (Me. 1996). So, where as here, there is a question as to the legal or factual viability of the plaintiffs' breach of contract claim found at count VIII, the plaintiffs should not be precluded from seeking relief under a theory of unjust enrichment.

In this regard, and with respect to the defendants' other argument, the plaintiffs cite evidence in their memorandum, properly in the record, which would support the three elements of unjust enrichment. Thus, the plaintiffs can establish (1) that Debra conferred a benefit on the defendants by paying them $422,000 and taking a

substantially defective house off their hands, (2) the defendants appreciated that benefit because of the converse of element 1 in that they were paid $422,000 and relieved of a defective house, and (3) the acceptance and retention by the defendant of these benefits under circumstances in which they were obtained by fraud would make it inequitable for the defendants to retain the benefit without payment of its value. *See Estate of White,* 521 A.2d 1180, 1183 (Me. 1987).

The payment of the value of the benefit, however, must take the form of restitution, that is, a payment to restore the complaining party to her original position. Horton & McGehee, *Maine Civil Remedies* § 7-2 (4th ed. 2004). While this might entail the equitable remedy of returning the $422,000 to Debra Weaver and the house back to the Blakes – perhaps an unwise choice for the former given its alleged current value – she nevertheless cannot have this option foreclosed to her as a matter of law.

From this, the court determines that plaintiff Debra Weaver[7] may pursue this cause of action and summary judgment will be denied as to count V of the complaint to her.

The Blakes also ask for summary judgment to be entered in their favor on count VI of the complaint which alleges the cause of action of intentional infliction of emotional distress. These defendants say that the Weavers cannot succeed with this claim because it is essentially the same as the claim articulated in count II, namely, the "intentional nondisclosure" of defects in the house for which only pecuniary, and not emotional, damages are recoverable. *See Jourdain v. Dineen,* 527 A.2d 1304, 1307 (Me. 1987).

---

[7] Again, Debra Weaver is the only plaintiff who can pursue this count as the evidence shows that only she conferred any benefit on the defendants.

The plaintiffs respond that Maine law would not prohibit them from pursuing the independent tort of intentional infliction of emotional distress even though the facts which might support such a claim also serve as the basis for a separate, but related, cause of action. *See Henricksen v. Cameron*, 622 A.2d 1135, 1142 (Me. 1993). Thus, as long as the facts which support the fraud claim can be proven so that that cause of action is viable so also would be the claim for intentional infliction of emotional distress. *Curtis v. Allstate Ins. Co..*, 2002 ME 9, ¶ 37, 787 A.2d 760, 769-70.

The Blakes also challenge the ability of the plaintiffs to prove the essential element of this tort that "the emotional distress suffered by the plaintiffs was so severe that no reasonable [person] could be expected to endure it." *Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 23.

In response, the Weavers point to Debra Weaver's deposition in which she testified that she experienced "anxiety attacks, depression, nightmares, loss of appetite, loss of sleep . . . hair loss . . .. night sweats . . ." which she attributes to the house, beginning after the first rain intrusion in August of 1999. D. Weaver Dep., pp. 110-112.

Calvin Weaver points to his deposition testimony that he had sleeping difficulties, weight loss and restlessness which he attributes to the stress caused by his home being in turmoil and his family being ill, presumably from the mold in the house which the plaintiffs associate with the water leakage.

Nicolle Sullivan has testified that she has suffered from memory loss, loss of concentration and diarrhea since moving into the house. Her testimony could also reasonably be interpreted to show that she also suffered from loss of balance, hair loss, headaches and tingling in her arms and fingers after her family moved into this house, a primary problem with which was the leaking French doors.

That said, however, there is no legal basis for Nicolle Sullivan to pursue this cause of action. Intentional infliction of emotional distress requires as an element of that tort that "the defendant[s] intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [their] conduct." *Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 22. In this case, however, the plaintiffs have offered no facts to support the contention that the defendants knew of Nicolle Sullivan or that she might be subject to injury via their alleged tortious acts. More importantly, however, the factual basis for this count is the non-disclosure of defects to the buyer of the house. Debra Weaver was the buyer of the house to whom such misleading disclosures were directed. As such, she is the party who is able to pursue this claim and not Nicolle to whom no communications were directed. It may also be concluded that Calvin Weaver was also subject to alleged non-disclosure or misleading information even though he cannot remain as plaintiff as to counts I and II because he suffered no pecuniary loss. According to the record, he requested that the plaintiffs respond to, among other problems, defects in the Peachtree doors. Weaver Dep. Exh. 13. PSAMF, ¶ 2. It is claimed that the reply to this inquiry, authored by Carol Blake, dated July 13, 1999, was misleading in that it represented that the problems with the doors had been rectified. Afterwards, Calvin's wife bought the house, apparently relying in part, on Carol's communication to him, and, thereafter, he lived in this allegedly defective home. Accordingly, Calvin Weaver has a claim against the defendants for his emotional distress based on the allegedly false disclosures made by defendant Carol Blake.

While the Blakes' can point to evidence which might contradict or serve to discount the severity of the symptoms suffered by the two plaintiffs who may pursue this claim, it must nevertheless be concluded that there exists a dispute of material fact

as to whether they suffered "severe" emotional distress which, while defined in the law, requires a subjective determination that must be left to a fact-finder.

The same may not be said as to plaintiff Nicholas Sullivan. The Weavers point to no evidence to show that he suffered severe emotional distress as the result of the defendants' alleged actions in concealing defects with the house. Moreover, as with Nicolle Sullivan, there is no basis to conclude that this plaintiff has standing to pursue this claim.

From all this, the court concludes that the motion must be granted as to Nicholas and Nicolle Sullivan but denied as to the two remaining plaintiffs and they may proceed with count VI to trial. This is because the court has found that the claim of intentional infliction of emotional distress may be prosecuted as a separate tort and that the two cited plaintiffs have presented sufficient evidence of standing and severe emotional distress to survive this motion. Finally, because the defendants have not challenged the causative connection between their alleged actions and the severe emotional distress claimed by these plaintiffs, the court declines to address this aspect of a claim of this nature.

The Blakes also seek summary judgment in their favor on count VII which alleges negligent infliction of emotional distress. The defendants argue, and the plaintiffs agree, that where there is a separate tort for which emotional damages may be awarded, this cause of action may not be pursued because a claim for emotional damages would be subsumed in any award for that other tort.. *Curtis v. Porter*, 2001 ME 158, ¶ 19, 784 A.2d 18, 26.

Here, however, there is no independent tort which will survive this motion which would permit the recovery of emotional damages. Accordingly, this cause of action can only be pursued if the claim pending is a "bystander liability" action or it

involves "a special relationship . . . between the actor and the person emotionally harmed." *Curtis v. Porter, id.* Here, there is no evidence that would allow this matter to be characterized as a "bystander case" and the law in Maine is that real estate transactions, even among friends, do not establish "a special relationship," *Eaton v. Soutag,* 387 A.2d 33,37, so that its abuses may lead to special damages.

Thus, because there is no separate tort by which the Weavers can recover emotional damages, and because this case does not fit into the categories for which such damages may be awarded if negligently inflicted, this claim may not proceed further, and summary judgment is to be entered for the Blakes on count VII of the complaint.

Count VIII is pled as a breach of contract as to which the Blakes claim the Weavers may not succeed as a matter of law. Their first argument in support of this contention is that the property disclosure statement, which contains the alleged misrepresentations about the house's condition, was a document provided by the Blakes to their realtor and, therefore, Debra Weaver was not a party to this event. Secondly, the Blakes say, this disclosure statement was never integrated into the contract to sell the property so cannot be considered part of that transaction.

As to the first of these arguments, the plaintiffs say they were third party beneficiaries of the contract expressed in the disclosure statement. As the case they cite teaches, however, in order to become a third party beneficiary, there must be an agreement between the promiser, the Blakes, and the alleged promisee, their realtor, which entails a right to performance of a third party. *Fleet Bank v. Harriman,* 1998 ME 225, ¶ 6, 721 A.2d 858, 660. This cannot be established here because there is no evidence that the disclosure statement was part of the listing contract between the Blakes and their realtor or that anyone was intended to benefit by the disclosure statement so that she could enforce it. *Id.* Indeed, current Maine law, though not applicable here, would

not permit a purchaser of real estate to rely on misrepresentations in a disclosure statement as the basis for a breach of contact claim between the buyer and the seller. 33 M.R.S.A. § 176(1).

It is also true, no evidence being shown to the contrary, that the disclosure statements were never made part of the purchase and sale agreement or the deed itself. As the defendants have argued, the disclosure statements were just that and not part of the exchange of considerations for the sale and purchase of the property.

Moreover, contrary to the thrust of the plaintiffs' arguments, even if the disclosure statement were a contract, it was collateral to the purchase and sale agreement and the deed because both of these concern an agreement to convey land. Accordingly, the disclosure statement merged into neither of these contracts so that its breach, if it is a contract, would affect those two separate contracts. *See Watervillle Industries v. Finance Authority of Maine,* 2000 ME 138, ¶ 16, 758 A.2d 986, 990. Thus, because the disclosure statement was neither a contract nor incorporated or merged into the subsequent contracts between the parties, the defendants' alleged "breach" by allegedly misleading the house's condition on the disclosure form is not actionable..

The plaintiffs also rely on the letter of July 13, 1999, from Carol Blake, which addressed completing the punch list, as part of the plaintiffs' breach of contract claim. However, it must be noted that the letter of July 13 is addressed not to Debra Weaver but to Roy Farmer, the Blakes' realtor, in response to a letter from Calvin Weaver who was not a party to any agreement. Its relevant contents can be construed to mean that the problem with the French doors had been corrected and that further research is being done to address "the condition of the broken seals in the French doors." Blake Dep. Exh. 26, DSMF, ¶ 40, Exh. 20.

In the court's view, the legal implications of this letter are indistinguishable from the disclosure form. It is a correspondence not to Debra Weaver, but to the defendants' realtor, and, perhaps, a non-contracting party, and does not form any part of an agreement with him or either of the Weavers, who, by that time, had already agreed to buy the property. Blake Dep. Exhs. 21, 23, 24; DSMF Exhs. 17-19. It was also not merged into the purchase and sale agreement and, therefore, if breached, does not affect those documents.

For all these reasons, then, summary judgment is to be entered for the defendants on count VIII of the complaint.

The Weavers title count IX of their complaint "Negligence," and in it they allege that the Blakes breached a duty as a reasonably prudent home seller to investigate and disclose material defects in the house by failing to find and reveal the various defects of which the plaintiffs complain. In the text of this count, however, the plaintiffs never allege that the defendants "negligently" breached the duties they describe. If it did, this count would be nearly indistinguishable from count IV, "Negligent Nondisclosure" which, as noted, is not recognized in Maine law as an actionable tort.

That said, and as has been observed herein, Maine law has never recognized a duty to disclose property defects to buyers absent a special relationship between the parties. *Kezer v. Mark Stimson Assoc.*, 1999 ME 184, ¶ 15, 742 A.2d 898, 903; *Stevens v. Bouchard*, 532 A.2d 1028, 1030 (Me. 1987). There being no duty to disclose, it follows that there is no duty to investigate potential defects in the property as the discovery of same would not need to be disclosed under our law. Thus, as discussed, infra, as to the counts involving the misrepresentation, the plaintiffs are limited under our law to such claims and have no legal basis to pursue a cause of action based on a "negligent" breach of a duty by the sellers of a house to investigate and disclose defects. Accordingly,

summary judgment is to be entered for the defendants on count IX of the complaint as there is no legal basis to prosecute this claim.

In count X, the plaintiffs do not articulate a separate cause of action but, instead, ask that punitive damages be awarded to them on their claims for fraud and intentional and "reckless" misrepresentations or non-disclosures. Complaint, ¶ 93. Both parties agree that if punitive damages are to be awarded, only counts I, II and VI qualify as bases for their award. The defendants argue, however, that the facts in this case are not sufficiently egregious that punitive damages may, as a matter of law be awarded. They also say that even if this argument is incorrect, only Debra Weaver may recover such extraordinary damages.

Addressing the second contention first, while it is true that Debra Weaver is the principal plaintiff in this case, the court has also found that Calvin Weaver may pursue his claim under count VI so would be eligible for punitive damages under that count if it succeeds. Because neither Nicolle nor Nicholas have established standing as to any count, they, of course, are ineligible to recover any damages, including punitive damages.

With respect to the argument that the facts are insufficient to support an award of punitive damages, it must be understood that whether or not a defendant acted with implied malice is a subjective decision which can only be made by a fact-finder. So while there is no evidence here of express malice, the court cannot conclude as a matter of law that the defendants' actions were not so outrageous that malice may not be implied or that the plaintiffs are unable to prove this by clear and convincing evidence. *Grover v. Minette-Mills, Inc.*, 638 A.2d 712, 717-718. Accordingly, even though a court might conclude that it is improbable that a party may prevail with a particular claim at trial, it may not decide a factual dispute before it via a motion for summary judgment.

*Searles v. Trustees of St. Joseph's College*, 1997 ME 128, ¶ 6, 695 A.2d 1206, 1209. Thus, while a fact-finder may ultimately find the plaintiffs' proof of implied malice lacking, it is not the court's prerogative to do so. Therefore, this motion will be denied with respect to Debra's claims under counts I, II and VI and Calvin's claim under count VI. It will be denied in all other respects.

### D.     Plaintiffs' Motion for Leave to File Surreply.

This motion, filed 27 days after argument was heard on the summary judgment motions, seeks to offer, on behalf of the plaintiffs, a rebuttal to the defendants' arguments that only Debra Weaver has standing to prosecute various claims recited in the complaint. The Blakes object to this motion and ask that the proposed surreply be stricken.

At the outset, it may be observed that the Rules of Civil Procedure do not contemplate a surreply in response to a reply in support of a pending motion. *See* M.R. Civ. P. 7. Even if such were permitted, no time limit under our rules would countenance the delay which occurred here – nearly four weeks after oral argument and three months after the defendants' reply memorandum was filed.

Also, plaintiff's reliance on M.R. Civ. P. 15(d) as authority for filing a surreply is misplaced. This rule addresses the filing of supplemental pleadings. Memoranda are not pleadings; pleadings consist of the complaint, the answer, a counterclaim, a crossclaim, or the like. *See, e.g.,* M.R. Civ. P. 8(a), 12 (b), 13.

More to the point, the court understood from the defendants' memorandum in support of its motion that they believed the only plaintiff with standing to pursue this case was Debra Weaver, either individually or as trustee, and the court has addressed the standing issue in this decision and order. Accordingly, the court concludes that

nothing is to be gained by accepting the proposed surreply even if the civil rules authorized such a filing.

## III.   Conclusion.

Based on the conclusions of law expressed herein, the clerk is DIRECTED to make the following entries:

A.   Defendant Middlesex Mutual Assurance Co.'s Motion for Summary Judgment is GRANTED in part and DENIED in part as follows:

The motion is GRANTED as to count XI of the complaint except as to plaintiffs' claims concerning the leaking dishwasher and PB pipes, and the presence of mold in the house as to which claims the motion is DENIED.

The motion is GRANTED as to counts XII, XIII, XV, XVI, XVII, XVIII, and XIX of the complaint and judgment is entered for this defendant on these counts.

The motion is GRANTED as to count XIV of the complaint as to the plaintiffs' claims which rely on a violation of 24-A M.R.S.A. § 2436-A(1)(A); it is DENIED as to their claims which rely on violations of 24-A M.R.S.A. § 2436-A(1)(B) and (E).

B.   Plaintiffs' Motion to Strike Defendant Middlesex Mutual Assurance Co.'s Supplemental Statement of Material Facts in Support of its Motion for Summary Judgment is GRANTED. Defendant Middlesex Mutual Assurance Co.'s Supplemental Statement of Material Facts in Support of its Motion for Summary Judgment is STRICKEN.

C.   Motion for Summary Judgment by Defendants David K. Blake and Carol J. Blake is GRANTED in part and DENIED in part as follows:

The motion is GRANTED as to count I of the complaint except as to plaintiff Debra Weaver's claims as to the septic system and the alleged leaking French doors as to which claims the motion is DENIED.

The motion is GRANTED as to count II of the complaint except as to plaintiff Debra Weaver's claims concerning the alleged concealment of the condition of the French doors as to which claims the motion is DENIED.

The motion is GRANTED as to count III of the complaint except as to plaintiff Debra Weaver's claims concerning the disclosures concerning

the septic system and the alleged leaks around the French doors as to which claims the motion is DENIED.

The motion is GRANTED as to count IV, VII, VIII and IX of the complaint and judgment is ENTERED for the defendants thereon.

The motion is GRANTED as to count V of the complaint except as to plaintiff Debra Weaver as to whom the motion is DENIED.

The motion is GRANTED as to count VI of the complaint except as to plaintiffs Debra Weaver and Calvin Weaver as to whom the motion is DENIED.

The motion is GRANTED as to count X of the complaint except as to plaintiff Debra Weaver's claims under counts I, II and VI of the complaint and plaintiff Calvin Weaver's claim under count VI of the complaint as to which claims the motion is DENIED.

D.      Plaintiffs' Motion for Leave to File Surreply is DENIED.

So ordered.

Dated: September__27__, 2004

John R. Atwood
Justice, Superior Court

**Pltffs':  Timothy Bryant, Esquire**
**            Michael Mahoney, Esquire**

**Defs' Blake:  Paul S. Douglass, Esquire**

**Def. Middlesex Mutual:  Martha Gaythwaite, Esquire**